## DEADWOOD CENT. R. CO. v. BARKER.

1. Underground water, found in gravel or just above bedrock, with no fissure in the bedrock and no well-defined banks, which was not traced beyond the point where it appeared in a tunnel, does not constitute a running stream, within Comp. Laws, § 2771, providing that a landowner owns water standing thereon or flowing over or under its surface, but not forming a definite stream.

2. Where plaintiff's predecessor in title occupied land prior to its entry as a townsite, and excavated a tunnel extending into defendant's land, appropriation of percolating water, found in the tunnel while the land was part of the public domain, did not give plaintiff a prescriptive right therein, so as to prevent an adjoining landowner from sinking a shaft on his own land, thereby diverting the water.

3. Where a tunnel excavated on plaintiff's land extended into defendant's land, and defendant permitted percolating water to flow through the same, which water was appropriated by plaintiff at the mouth of the tunnel, defendant was not estopped by his long-continued disuse of the water from diverting it on his own land, since plaintiff ac-

quired no easement in defendant's property, the use being entirely on plaintiff's own land.

(Opinion filed June 12, 1901.)

Appeal from circuit court, Lawrence county. HON. JOSEPH B. MOORE, Judge.

Suit by the Deadwood Central Railroad Company against John Barker. From a judgment in favor of the plaintiff, the defendant appeals. Reversed.

The facts are stated in the opinion.

*C. E. Davis* and *James A. George,* for appellant.

The issuance of a patent relates back to the entry so as to cut off all intervening rights. Stark v. Starr, 6 Wall. 402; Silver Bow & M. Co. v. Clark, 6 Mont. 422; Talbott v. King, 6 Mont. 107.

The occupancy in this case under settlement and entry was an appropriation of water which could not be displaced by Scott or his grantees. Sturr v. Beck, 133 U. S. 641.

A flow of water cannot become the subject of location, where it was precipitated in the drift by the ordinary percolation through the soil. Metcalf v. Nelson, 8 S. D. 89, 65 N. W. 911; Wheatley v. Baugh, 25 Pa. St. 532.

It is only where water does flow in well defined streams or water course through body of the earth, and this fact can be shown that an adjoining owner has, or can, enforce, any correlative rights. Comp. Laws, § 2771; Metcalf v. Nelson, 8 S. D. 89; Hanson v. McCune, 42 Cal. 303; Village v. Yeoman, 45 N. W. 362; Railroad Co. v. Dupaur, 95 Cal. 615.

*Frawley & Laffey, N. K. Griggs,* and *Ivan W. Goodner,* for respondent.

Respondent is the owner of the appropriation simply because the water was appurtenant to the lot and so passed under the various

conveyances of warranty under which respondent holds.   Stat. §§ 2682, 3248, 4709; Hall v. Railroad, 42 N. E. 1056; Coventon v. Stauffer, 32 Pac. 508-510; Clyne v. Water Co., 34 *Id.* 714; Crooker v. Benton, 28 *Id.* 953; Ely v. Ferguson, 27 *Id.* 587-8.

An occupant of public land, without title, may, by use of the waters from springs on adjoining public land, acquire a right to their use as against subsequent purchasers of the land on which such springs are situated.   Williams v. Harter, 53 Pac. 405.

Water combined with the earth, or passing through it by percolation or filteration, or chemical attraction, has no distinctive ownership from the earth itself any more than the metalic oxide of which the earth is composed.   Water, whether moving or motionless *in the earth*, is not in the eye of the law, distinct from the earth.   Rooth v. Driscoll, 20 Conn. 540.   See, also, Hanson v. McCue, 42 Col. 303; Ballard v. Tomlinson, 24 Amr. Law. Reg. 636.   But when percolating waters collect *or are gathered in a stream* running in a definite channel, no distinction exists between waters so running under the surface or upon the surface of the land.   They are such property, or incidents to property, as may be acquired by grant, express or implied, or by appropriation, and when rights in them are acquired the owner cannot be divested of his rights by the wrongful acts of another.   Cross v. Kitts, 10 Pac. 412, Metcalf v. Nelson, 8 S. D. 89.

No distinction exists between waters running under the surface in defined channel, and those running in distinct channels upon the surface.   The distinction is made between all waters running in distinct channels, whether upon the surface or subterranean, and those oozing or percolating through the soil in varying quantities and uncertain directions.   Strait v. Brown, 16 Nev. 317; Kinney on Irrigation, Sec. 79.

If subterranean water has assumed the proportion of a well-defined and constant stream, the owner of the land through which it flows will not be authorized to divert it or improperly use it, any more than if the stream ran upon the surface. The only difference in the application of the law to surface and subterranean streams will be in ascertaining the character of the streams. What is on the surface can be seen, but that which is under the ground cannot be so readily understood, and, of course, there will be more difficulty in ascertaining it. Tampa Co.v. Kline, 20 So. 784. It is a matter of no moment whether water reaches a certain point by percolation through the soil, by a subterranean channel, or by an obvious surface channel. If by any of these natural methods it reaches the point, and is then appropriated in accordance with the law, the appropriator has a property in it which cannot be divested by the wrongful diversion by another, nor can there be any substantial diminution. McClellan v. Hurdle, 33 Pac. 282; Kinney on Irrigation, Sec. 299.

CORSON, J.   This action was brought by the plaintiff to restrain the defendant from cutting off and diverting the water supply to which plaintiff claimed to be entitled. The action was tried by the court, without a jury, the findings and judgment were in favor of the plaintiff, and the defendant appeals.

The facts may be briefly stated as follows: The plaintiff is the owner of probate lot 109, of the town site of Deadwood. The defendant is the owner of probate lot 362, adjoining. In the spring of 1877, before the town site was entered, one J. J. Williams and partner ran a tunnel mainly on what is now known as "Probate Lot 109", but extending into probate lot 362, for the purpose of prospecting a gold placer mine. At or near the face of the tunnel

water was encountered, which found its way to the mouth of the tunnel, and since that time sufficient water has come from the tunnel to fill a 1½-inch pipe. Since 1890 this water has been taken by pipe to a reservoir of the plaintiff, where it has been used by the company for supplying its locomotives and for other purposes. In 1889 the defendant went into this tunnel and excavated from a point about 30 feet from its face a branch tunnel, some 30 feet in length, and extending a few feet into his own ground, and there encountered the same flow of water, and since that time has constructed a reservoir upon his own ground, cutting off substantially the supply of water found at the face of the main tunnel, and at the time of the commencement of this action was preparing, and had threatened, to erect an engine for the purpose of raising the water to the surface on his own ground, and disposing of it to such persons as might require it. The court, in its first finding of fact, found that in the running of such tunnel an underground stream was encountered and uncovered upon the land now owned by the defendant, and that the said stream so uncovered and encountered has since continued to flow therefrom in a strong and steady volume, up to and at the time of the commencement of the action. In its ninth finding the court finds as follows: "That the said waters so encountered and uncovered in said older tunnel, in the year 1877, then constituted and were, and ever since said time have continued to be, a running and definite stream, formed by nature, flowing under the surface of the earth, at first into said old tunnel, and later into said new or branch tunnel; that at the point where, and time when, defendant so threatened and intended to take and divert said water, the same constituted and was a permanent, definite, and well-defined running stream, formed by nature, and existing continuously from said point, by means of tunnel as aforesaid, down to and upon

said lands of plaintiff." The court further finds that in the spring of 1878, before the said townsite of Deadwood was entered, one Daniel Scott entered upon and went into the possession of the tract of land now described as "Probate Lot 109." and now owened by the plaintiff, and duly appropriated for domestic and mechanical purposes all the water of said stream so flowing from the mouth of the tunnel. Thereafter, on June 17, 1878, the land so occupied by said Scott, as also that now occupied by the defendant, was duly entered as a part of the townsite of Deadwood by the probate judge of Lawrence county. On June 20, 1882, the probate judge of Lawrence county conveyed to the wife of said Scott the premises known as "Lot 109" —Mrs. Scott and her husband then being occupants of said premises—and they continued to use the waters of said stream, under and by virtue of said appropriation, up to May 1, 1883, at which time they conveyed said premises by deed of general warranty to Lawrence Connell, from whom plaintiff has acquired title, together with said water appropriation or right. The court further finds that since the spring of 1878 the said Scott, and his grantees and successors in interest, including the present plaintiff, have continued to use the water of said stream for domestic and other purposes. On June 24, 1882, the probate judge of Lawrence county conveyed to one George Staiger probate lot 362. Staiger thereafter, on April 24, 1884, conveyed the same to the defendant herein, who has ever since remained the owner and in the possession of said premises, and has continued to occupy the same, with his family. The court further finds that in the year 1898 the defendant sunk a shaft or well on his own lot, down to and below the level of said tunnels, for the purpose of enabling him to pump the water of said stream into a tank erected on the surface, within the limits of his lot, and was preparing to erect an engine thereon for pump-

ing the water in said tunnel to the surface, as before stated. The court from these findings concluded, as matter of law, that the plaintiff was entitled to judgment as prayed for. Exceptions were taken to several of these findings of fact and conclusions of law, and a motion for a new trial was made and denied.

The grounds for a reversal are thus stated by appellant in his brief: "First, that Scott could acquire no interest in this water right for the reason that probate lot 362 was not a part of the public domain at the time of the location of the pretended water right; second that the water was not running in a definite stream formed by nature over or under the surface of the earth, and that the same was not a natural stream or spring, within the meaning of Section 2771, Comp. Laws; third, that Scott never parted with any interest that he might have acquired; fourth, that it shows, by a clear preponderance of evidence, that the water appearing upon probate lot 362 was precipitated by seepage and percolation, and was part of the soil; fifth, that no rights could accrue to the plaintiff by reason of the adverse use of such water; sixth that the decree of the court takes from the defendant his land and homestead."

In our view of the case, the principal question to be determined is, did the waters encountered in the old and branch tunnels constitute a running stream, with well-defined banks, formed by nature under the surface or was the water that found its way to the face of the tunnels caused by seepage and percolation? It was found by the court, and is not disputed, that the water in the old tunnel and in the branch tunnel was encountered within the lines of defendant's lot as now claimed by him. It appears from the evidence that the mouth of the tunnel is in a gulch or ravine, and that the land rises from this gulch in the direction of the tunnel, and at the point where defendant's shaft was sunk

the tunnels are some thirty feet or more below the surface, and from that point the land continues to rise for a considerable distance. The elevation of defendant's land is considerably higher than the land owned by the plaintiff. Section 2771, Comp. Laws, provides as follows: "The owner of the land owns water standing thereon, or flowing over or under its surface, but not forming a definite stream. Water running in a definite stream, formed by nature over or under the surface, may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same." It will be observed that by the terms of this section the owner of the land owns the water standing thereon or flowing through or under its surface, but not forming a definite stream. Mr. Kinney, in his work on Irrigation, defines an underground stream as follows: "Sec. 48. * * * These water courses are divided into two distinct classes—those whose channels are known or defined, and those unknown and undefined. It is necessary to bear this distinction in mind in our discussion, as they are governed by entirely different principles of law. And in this connection it will be well to say that the word 'defined' means a contracted and bounded channel, though the course of the stream may be undefined by human knowledge; and the word "known" refers to knowledge of the course of the stream by reasonable inference. Regarding the laws governing these two classes, it must be known that if underground currents of water flow in well-defined and know channels, the course of which can be distinctly traced, they are governed by the same rules of law that govern streams flowing upon the surface of the earth. The owner of land under which a stream flows can therefore maintain an action for the diversion of it. if such

diversion takes place under the same circumstances as would enable him to recover if the stream had been wholly above ground. But for this purpose the underground water must flow in known and well-defined channels, so as to constitute regular and constant streams, in order that the riparian owner or appropriator may invoke the same rules as are applied to surface streams, or otherwise the presumption will be that they have their sources in the ordinary percolations through the soil. This rule practically disposes of the second class of subterranean waters—those whose channels are unknown and undefined—although there are undoubtedly a great many underground streams whose waters flow in confined channels, but whose courses are not known, and, following the above rule, these are all classed with percolating waters. Sec. 49. Percolating Waters. Percolating waters are those which pass through the ground beneath the surface, without definite channels, although the same rules of law govern those which have definite channels, but the course of which is unknown and unascertainable. Where there is nothing to show that the waters of a spring or well are supplied by any defined flowing stream, the presumption will be that they have their source in the ordinary percolations of water through the soil. Percolating waters, and those whose sources are unknown, belong to the realty in which it is found. The reason for this rule is that, as percolations spread themselves in every direction through the earth, it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. The law does not, therefore, forbid their disturbance." Kin. Irr. §§ 48, 49. These views of the learned author seem to be fully sustained by the authorities. In Hanson v. McCue, 42 Cal. 303, 10 Am. Rep. 299, the supreme court of California, in discussing a case quite analogous to the one

now before us, uses the following language: "It [the percolating water] exists there free from the usufructuary right of others, which is to be respected by the owner of an estate through which a defined stream of water is found to flow. The owner may appropriate the percolations and filtrations as he may choose, and turn them to profit if he can. To hold otherwise would be to hold that the plaintiff here could lawfully claim a right to convert the lot of McCue into a mere filterer for his own convenience. 'Such a claim,' said the supreme court of Pennsylvania in Wheatley v.Baugh, 25 Pa. 528, 'if sustained, would amount to a total abrogation of the right of property. No man could dig a cellar or a wall or build a house on his own land, because these operations necessarily interrupt the filtrations through the earth. Nor could he cut down the forest, or clear his land for the purpose of husbandry, because the evaporation which would be caused by exposing the soil to the sun and air would inevitably diminish, to some extent, the supply of water which would otherwise filter through it. He could not even turn a furrow for agricultural purposes, because this would partially produce the same result.' " Chatfield v. Wilson, 28 Vt. 49 ;Clark v. Conroe's Estate, 38 Vt. 469; Wheatley v. Baugh, 25 Pa. 528; City of Emporia v. Soden, 25 Kan. 588, 37 Am. Rep. 265; Railroad Co. v. Dufour, 95 Cal. 615, 30 Pac. 783; Wilson v. City of New Bedford, 108 Mass. 265; Trustees, etc., of Village of Delhi v. Yeomans, 50 Barb. 316; *Id.,* 45 N. Y. 362, 6 Am. Rep. 100.

It is quite clear, therefore, from the authorities, that the stream of water contemplated is a running stream, having well-known and defined banks. The finding of the court that there was such a stream encountered near the face of the old tunnel and at the face of the new tunnel is not, in our view, sustained by the evidence. It seems to be conceded that the water found in these tunnels had

never appeared on the surface at any point in that vicinity before the excavation of said tunnels. Mr. J. J. Williams, a witness for the defendant, who was a partner in the work of running the tunnel, and examined the same about the time it was completed, in the spring of 1877, says: "The water was coming in from the bottom of the tunnel, probably from the sides—mainly from the bottom, through the gravel on the bedrock." He further says that the water was struck after he had prosecuted this work about eighty-five feet; that he saw no stream of water gushing out through a crevice in the rock, or anything of that kind. He further says that, as they found no pay gravel he and his partner abandoned the work. The testimony of Mr. Sebastian, Mr. White, Mr. Ward, and Mr. Barker, witnesses for the defendant, was substantially the same. J. R. Hickox, a witness on the part of the plaintiff ,testified that he was a civil engineer, and had been such for thirteen years. In speaking of the water coming into the sump or basin sunk at the bottom of the shaft, he says: "I have been up to the well, or basin, in this dispute since I was on the stand yesterday. Mr. Jackson was with me. I went down into the shaft. I went down to find where the water came into that basin, I baled the water out of the basin, and lowered the surface of the water below the top of the bedrock, and after we got the water down, so we sould see where the water was coming in, we found quite a large stream of water coming in at the southeast corner, or about six inches north of the southeast corner; another small stream coming in along near the southeast corner; that was practically where all the water was coming in the basin, a distance of two feet being covered—the surface where the water was coming in. I should say that the amount that was coming in was about the same quantity that run out. It was coming in at the southeast

corner.  I should call it a stream.  It was flowing in a solid stream right over the surface of the bedrock, into the basin—a good strong stream.  There must be a depression in the bedrock just like a stream in the bedrock.  Of course, this bedrock is covered with gravel but it runs right through the gravel, where I saw it coming in.  Was coming in a steram right through the gravel.  I should not call it percolating water where it came in at all.  It was a definite place.  It had a definite point at which it came in.  It was flowing in a stream which apparently had a definite course, which it was flowing in, in the channel of the bedrock.  It was not varying in its course where I saw it.  It was flowing in a positive direction.  It would be a depression in the bedrock, the same as would hold any stream.  I examined the basin or sump to see how the bedrock was down in that tunnel.  I found that the bedrock fell away at the rate of about one foot in eight, as it went east-west.  The bottom of the tunnel was about a foot above bedrock at the distance of about eight feet way.  I took an iron rod, and ran it down through the gravel, until I found where the surface of the bedrock was, and that was one foot lower than it was at the west side of the sump, so there was a fall of one foot in eight in the bedrock going west."  On cross-examination he says: "I could not find any crevice in the rock at all.  The water came in on the surface of the bedrock, and did not come in through any opening in the bedrock.  The flow of the water was between the gravel formation and the bedrock, right on the surface of the bedrock.  This gravel extends right up to the rim of the old sump."·  The other witnesses on the part of the plaintiff corroborated the evidence of Mr. Hickox, but they all admitted that there was no crevice or open-ing in the bedrock, and that the water apparently had no well defined banks or channel; that it flowed through the gravel on top of the

bedrock, and was simply seeking a lower level. In what manner the water passed from the face of the old tunnel to the sump at the face of the branch tunnel is not shown. A diagram was introduced in evidence, but, as it is not properly lettered, it affords us but very little assistance. That these waters run in any well-defined channel, with well-defined banks, does not seem to be established by the evidence. But the evidence would seem to establish the fact that percolating or seeping waters accumulated at that point, and were uncovered or encountered at the face of the tunnel, and were detained there by the sump sunk by the defendant on his own ground. Underground streams of water, having defined banks, spoken of by the text-books and decisions, refer mainly to streams of water in the arid regions, which flow partly on and partly beneath the surface, but always in a well-defined channel, and within well-defined banks. To hold, therefore, that water found in gravel, on or just above bedrock, with no fissure in the bedrock, and no well-defined banks, and which has not been traced beyond the point where it appears in the tunnel, constitutes a running stream, within the meaning of our statute and decisions, would be to establish a very dangerous doctrine, as affecting the rights of property owners, and would have a tendency to abrogate the well-established doctrine that the owner of land owns all within its boundary lines, extending downward and upward.

The next question presented is as to the sufficiency of the appropriation of the waters encountered in the tunnel by Scott in the spring of 1877. It is contended on the part of the respondent that assuming that under ordinary circumstances the defendant would be entitled to any water found within the limits of his own lot, and that the water encountered in the tunnel did not constitute a running stream, still the plaintiff was entitled to the water found in this

tunnel, for the reason that it was appropriated by Scott prior to the entry of the townsite, and while the premises claimed by the defendant constituted a part of the public domain; but we cannot agree with the respondent in this contention. The law of appropriating waters contemplates the appropriation of waters constituting running streams, having a well-defined channel and banks, and has no application to mere percolations or seeping waters found under the surface.

The main case relied upon to support the respondent's contention is the case of Sullivan v. Mining Co., 11 Utah, 438, 40 Pac. 709, 30 L. R. A. 186. By the statute of Utah it is provided: "A right to the use of water for any useful purpose, such as domestic purposes, irrigating lands, propelling machinery, washing or sluicing ores and other like purposes is hereby recognized and acknowledged to have vested and accrued as a primary right to the extent of and reasonable necessity for such use thereof under any of the following circumstances: First, whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake or spring or other natural source of supply." Section 2780, Comp. Laws Utah. It was therefore held that where a party had sunk a well upon the public domain, he had a right to the use of the water of such well; but, as stated by the court: "This right of the appropriator is, of course, subject to the rule of law which will permit the owner to sink an adjoining well on his own premises, although he should thereby dry up that of the first appropriator." Under the statute of Utah, therefore, the right of the appropriator therein is a very limited one, and the decision, with the conclusion therein stated, does not sustain the contention of the respondent; for here the defendant has done precisely what the supreme court of Utah held he had a right to .

do, namely, sunk an adjoining well on his own premises. The court in that case very properly concedes that they have found no case going to the extent of that decision, even with the conclusion reached by the court. In the subsequent case of Crescent Min. Co. v. Silver King Min. Co., 17 Utah, 444, 54 Pac. 244, which was a case quite analogous to the case at bar, the court held that percolating water from a mining claim, after passing into a tunnel dug for the purpose of developing a mine, and not naturally flowing from or in a natural stream with well-defined channel and banks, is not subject to appropriation by another, where the water runs in the tunnel on the owner's land. The court further held that the rules of law applying to surface streams do not apply to percolating water and subterranean streams with no defined and known channel, course, and banks, and in the course of the opinion the court says: "The rule is that, whenever the stream is so hidden in the earth that its course is not discoverable from the surface, there can be no such thing as a prescription in favor of an adjacent proprietor to have an uninterrupted flow of such stream through the land of his neighbor. Haldeman v. Bruckhart, 45 Pa. 514; Lybes, Appeal, 106 Pa. 626; Buffnem v. Harris, 5 R. I. 243. It is clear that prior to the time when the tunnel was dug upon the mining claim of the defendant, the water was percolating water, flowing, seeping, or circulating in minute particles beneath the surface thereof, without banks or defined channels, and that its course was invisible and unknown." The court, also, in the opinion, refers to the case of Sulivan v. Mining Co., *supra,* and distinguishes it from the case then under consideration.

Assuming that the common law has been modified in this state as laid down by the courts of the Pacific Coast states, still Scott could have acquired no rights to seeping or percolating waters found in

the tunnel, as against one who became the owner of the land in which said waters were found. Scott v. Toomey, 8 S. D. 639, 67 N. W. 838. Assuming, therefore, without deciding, that the plaintiff acquired all the rights of Scott, it would not avail it in this action. Sections 2339,2340, Rev. St. U. S., read as follows: "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same. * * *" "All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the preceding section." But the question under these provisions of the statutes of the United States must always be, what appropriation is required by the usage, customs, laws, and decisions of the courts? Mr. Kinney, in his work on Water Rights, in speaking of appropriation of subterranean waters, says: "Where subterranean waters are running in a defined channel, no distinction exists between waters so running under the surface or upon the surface of the earth. * * * But, on the other hand, waters merely percolating through the soil, without a defined channel, are not governed by the same laws that surface streams are. Water percolating through the soil belongs to the owners of the freehold where it is found." Section 298, Kin. Irr. In Railroad Co. v. Defour, 95 Cal. 615, 30 Pac. 783, the supreme court of California held: "The law controlling the rights of subterranean waters not running through a channel or defined course is very different from that affecting the rights of surface streams. In the former case the water belongs to the soil, is part of

it, is owned and possessed as the earth is, and may be used, removed, and controlled to the same extent by the owner, and no action will lie for injuries caused by cutting it off." The court cites with approval Hanson v. McCue, *supra.*

The respondent contends that the appellant is estopped from interfering with the plaintiff's appropriation of the water as claimed for the reason that he permitted said waters to flow down to the mouth of said tunnel, and be taken by this plaintiff by its pipe line to its tank, and made no objection thereto until shortly before the commencement of this action, in 1898; or, in other words, that the defendant had full knowledge that the waters from said tunnel were appropriated and used by the plaintiff subsequently to 1890, and at no time made any objection to such diversion until about the time of the commencement of this action. But this contention is not tenable, for the reason that the' defendant had no cause of action against the plaintiff by reason of its taking the water from the mouth of the tunnel on its own land. So long as the defendant permitted the water to flow from his own land into the tunnel, he could not complain of its appropriation by the plaintiff; hence the plaintiff acquired no easement in the defendant's property, and the defendant lost no right thereby to sink upon his own property a shaft to collect the percolating waters found therein. Crescent Min. Co. v. Silver King Min. Co., *supra.* The question now presented was fully discussed in that case, and it was there held that a party could not have maintained an action to prevent the plaintiff from using the water while he was permitting it to pass from its tunnel on his land. Ellis v. Duncan, 21 Barb. 230; Chatfield v. Wilson, 28 Vt. 49; Railroad Co. v. Peterson, 14 Ind. 112, 77 Am. Dec. 60; Frazier v. Brown, 12 Ohio St. 294; Trustees, etc., of Village of Delhi v. Yeomans, 50 Barb. 316; Id. 45 N. Y. 362, 6 Am. Rep. 100; Swett

v. Cutts, 50 N. H. 439, 9 Am. Rep. 276; Mosier v. Caldwell, 7 Nev. 363; Chase v. Silverstone, 62 Me. 175, 16 Am. Rep. 175; Taylor v. Fickas, 64 Ind. 167, 31 Am. Rep. 114; Coleman v. Chadwick, 80 Pa. 81; Chesley v. King, 74 Me. 164, 43 Am. Rep. 569; Blood-good v. Ayres, 108 N. Y. 400, 15 N. E. 433, 2 Am. St. Rep. 443; Id., 37 Hun. 356. We are of the opinion, therefore, that the judgment of the court below should be reversed, and a new trial granted; and it is so ordered.