KNIGHT, Appellant v. GRIMES et al., Respondents

(127 N.W.2d 708)

(File No. 10072.   Opinion filed April 21, 1964)

Rehearing denied May 20, 1964

**W. W. Knight,** pro se.

**Frank L. Farrar,** Atty. Gen., **Walter Weygint, Alan Williamson,** Asst. Attys. Gen., Pierre, for Defendants and Respondents.

BANDY, Circuit Judge.   In an action seeking a declaratory judgment the plaintiff as the owner of land overlying ground water, attacks the constitutionality of Chapters 430 and 431 of the Laws of 1955. (Now, respectively, SDC 1960 Supp. 61.01 and 61.04)

He contends that these acts violate the 5th and 14th Amendments to the Constitution of the United States, and sections 2 and 13 of Article VI of the South Dakota Constitution. Upon full consideration of the matter the trial judge dismissed the action. In so doing he recognized plaintiff's vested right to irrigate four acres of land by reason of prior appropriation.

Many procedural questions have been raised, but as we do not consider them material to disposition of the case we proceed directly to the determinative issues.

■ The Desert Land Act, Ch. 107, 19 Statutes at Large, 377 (43 U.S.C.A. § 321) became effective in 1877. The patents for the land involved herein were issued in 1882. They carried with them no water rights. California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356. In fact, on the oral argument the plaintiff conceded that the rights he claims arose under territorial and state law. We proceed on that theory.

At and prior to the issuance of these patents the matter of "water rights" had been fixed by statute in Dakota Territory. By section 255 Revised Civil Code of 1877 it was provided:

"The owner of the land owns water standing thereon, or flowing over or under its surface, but not forming a definite stream. Water running in a definite stream, formed by nature over or under the surface, may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same."

By the year 1955 this statute, through a series of amendments had been modified to read in SDC 61.0101 as follows:

"Ownership and right of use. Subject to vested private rights, and except as hereinafter in this section specifically provided, all the waters within the limits of this state, from whatever source of supply, belong to the public and, except navigable waters, are subject to appropriation for beneficial use. Subject to the pro-

visions of this Code relating to artesian wells and water, the owner of the land owns water standing thereon, or flowing over or under its surface, but not forming a definite stream. Water running in a definite stream, formed by nature, over or under the surface, may be used by such landowner as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, or of a natural spring arising on his land which flows into and constitutes a part of the water supply of a natural stream, nor pursue nor pollute the same, except that any person owning land through which any nonnavigable stream passes, may construct and maintain a dam across such nonnavigable stream if the course of the water is not changed, vested rights are not interfered with, and no land flooded other than that belonging to the owner of such dam or upon which an easement for such purpose has been secured. Nothing in this section shall be construed to prevent the owner of land on which a natural spring arises, and which constitutes the source or part of the water supply of a definite stream, from acquiring a right to appropriate the flow from such spring in the manner provided by law for the appropriation of waters."

Chapter 430, Laws of 1955 expressly repealed SDC 61.0101 and substituted in lieu thereof a statute containing the following provisions:

"61.0101 General state policy. It is hereby declared:

"(1) That because of conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this

state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of diversion of water;

"(2) That all water within the state is the property of the people of the state, but the right to the use of water may be acquired by appropriation in the manner provided by law;

"(3) That the people of the state have a paramount interest in the use of all the water of the state and that the state shall determine what water of the state, surface and underground, can be converted to public use or controlled for public protection;

"(4) That the protection of the public interest in the development of the water resources of the state is of vital concern to the people of the state and that the state shall determine in what way the water of the state, both surface and underground, should be developed for the greatest public benefit;

"(5) That it is the established policy of this state:

"(a) that the use of water for domestic purposes is the highest use of water, and takes precedence over all appropriative rights;

"(b) That the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for existing and future uses, but that no municipality shall acquire or hold any right to waste any water, or to use water for other than municipal purposes, or to prevent the appropriation and application of water in excess of its reasonable and existing needs to useful purposes by other subject to the rights of the municipality to apply such water to municipal uses as and when necessity therefor exists."

The remainder of the chapter concerns itself with procedures relating to "waters flowing in definite streams."

Chapter 431, Laws of 1955 expressly repealed the provisions contained in SDC 61.04, which had been headed and described as "Regulations as to Wells," and which specifically described and referred to artesian wells.

This new SDC 1960 Supp. 61.04 is particularly directed to ground water, therein described as " 'Ground water,' under the surface, whatever may be the geologic reservoir in which it is standing or moving." It defines vested rights as being:

"61.0401 (11) 'Vested rights', beneficial uses of ground water under diversions and applications of water prior to the passage of this chapter. The right to take and use water for beneficial purposes where an owner or lawful agent is engaged in the construction of works for the actual application of water to a beneficial use at the time of the passage of this chapter, provided such works shall be completed and water is actually applied for such use within a reasonable time thereafter." By SDC 1960 Supp 61.0404 it is provided:

"Appropriation of water. Subject to vested rights as herein defined, any person desiring to appropriate any ground water described in this chapter shall give notice to the Commission in a form to be prescribed, the beneficial use to which it is proposed to apply such water, the location of the proposed well, the name of the owner of the land on which such well will be located, the amount of water applied for, the use for which it is desired and if the proposed use is irrigation, the description of the land to be irrigated and the name of the owner thereof. Notice shall be required for wells on which construction has commenced or has been completed prior to the effective date of this chapter. If the use to which the water is to be put is a domestic use, no application need be made. In all other respects the procedure for appropriating water under chapter 61.01 shall be followed insofar as practicable."

■ Apparently desiring to directly involve both Chapters 430 and 431, Laws of 1955 the plaintiff offered to stipulate that both well defined streams and percolating waters were to be found under different areas of his land. The defendants declined this offer and presented evidence from which the trial judge, erroneously, we think, found that the waters under the plaintiff's land constitute a definite stream. We believe that the record shows only percolating waters to underlie the plaintiff's land.

With relation to water rights, three situations could exist:

(1) Where the common law had not been applied. (2) Where the common law had been applied. (3) Where a statute had been enacted. Clearly, the third situation exists here and is highlighted by prior opinions of this court, particularly St. Germain Irrigating Ditch Co. v. Hawthorne Ditch Co., 1913, 32 S.D. 260, 143 N.W. 124.

The question, squarely presented, is as to whether the legislature may, without compensation, abolish the rule of (so-called) absolute ownership of unappropriated percolating waters and substitute the doctrine of appropriation for beneficial use under state supervision?

■ Beyond doubt there has been an invasion of a pre-existing right or interest. It seems desirable to clearly focus on the nature of this right or interest. The notion that this right to take and use percolating water constitutes an actual ownership of the water prior to withdrawal has been demonstrated to be legally fallacious. Bassett v. Salisbury Mfg. Co., 1862, 43 N.H. 569, 82 Am.Dec. 179; Katz v. Walkinshaw, 1902, 141 Cal. 116, 70 P. 663, 64 L.R.A. 236; Ohio Oil Company v. Indiana, 1900, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729. In fact this was recognized by this court in Metcalf v. Nelson, 1895, 8 S.D. 87, 65 N.W. 911, wherein it wrote:

"While it may not be technically correct to say that the landowner is the absolute owner of percolating waters gathered into a spring or well, such is often the expression of the courts and text writers, and probably

means what, in respect to water, is practically equivalent to ownership,—the exclusive right to use and dispose of it."

Likewise, this court in Deadwood Central R. Co. v. Barker, 1901, 14 S.D. 558, 86 N.W. 619, perceived that the rule was adopted to protect the landowner in the use of his own land and not as a statement of property rights in percolating water, saying:

" ' * * * The reason for this rule is that, as percolations spread themselves in every direction through the earth, it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. The law does not, therefore, forbid their disturbance.' "

It should be noted that Section 265 of the 1877 Revised Civil Code pertaining to this matter provided:

"The owner of land in fee has the right to the surface and to everything **permanently** situated beneath or above it." (Emphasis supplied)

South Dakota is largely a semi-arid state. The legislature was fully justified in finding that the public welfare requires the maximum protection and utilization of its water supply.

Borrowing the language of the court in Southwest Engineering Co. v. Ernst, 1955, 79 Ariz. 403, 291 P.2d 764, involving the constitutionality of a somewhat similar statute, the court wrote:

"It can thus be seen that a conflict occurs between appellant and the state by reason of the interest of the public in the preservation from destruction of a resource essential to the sustenance of life. Where the public interest is thus significantly involved, the preferment of that interest over the property interest of the individual even to the extent of its destruction is a distinguishing characteristic of the exercise of the police power. The principle which we recognize here as controlling rests upon historic precedent extending back into the common

law, Respublica v. Sparhawk, 1 Dall. 357, 1 L.Ed. 174, Bowditch v. City of Boston, 101 U.S. 16, 25 L.Ed. 980, and has had continuous recognition almost to the present moment. United States v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157.

"It has application not alone to the disasters of fire, flood, pestilence and war, but to other circumstances where public interests dictate an unavoidable choice between one class of property as against another."

As is summarized in 11 Am.Jur., Constitutional Law, at page 1009 thereof:

"No rule in constitutional law is better settled than the principle that all property is held subject to the right of the state reasonably to regulate its use under the police power in order to secure the general safety, public welfare, public convenience and general prosperity, and the peace, good order, and morals of the community."

In Hudson County Water Co. v. McCarter, 1908, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828, it was written:

"All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the state. The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by the decisions that this or that concrete case falls on the nearer or farther side. * * *

"It sometimes is difficult to fix boundary stones between the private right of property and the police power when, as in the case at bar, we know of few decisions

that are very much in point. But it is recognized that the state as **quasi**-sovereign and representative of the interests of the public, has a standing in court to protect the atmosphere, the water, and the forests within its territory, irrespective of the assent or dissent of the private owners of the land most immediately concerned.* * *
"* * * it appears to us that few public interests are more obvious, indisputable, and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit for the purpose of turning them to a more perfect use. This public interest is omnipresent wherever there is a state, and grows more pressing as population grows. It is fundamental, and we are of opinion that the private property of riparian proprietors cannot be supposed to have deeper roots. Whether it be said that such an interest justifies the cutting down by statute, without compensation, in the exercise of the police power, of what otherwise would be private rights of property, or that, apart from statute, those rights do not go to the height of what the defendant seeks to do, the result is the same. * * * The private right to appropriate is subject not only to the rights of lower owners, but to the initial limitation that it may not substantially diminish one of the great foundations of public welfare and health.

"We are of opinion, further, that the constitutional power of the state to insist that its natural advantages shall remain unimpaired by its citizens is not dependent upon any nice estimate of the extent of present use or speculation as to future needs. The legal conception of the necessary is apt to be confined to somewhat rudimentary wants, and there are benefits from a great river that might escape a lawyer's view. But the state is not required to submit even to an aesthetic analysis. Any analysis may be inadequate. It finds itself in possession of what all admit to be a great public good, and what it has it may keep and give no one reason for its will.

"The defense under the 14th Amendment is disposed of by what we have said."[1]

The scope of this power is summarized in 11 Am.Jur., Constitutional Law, § 302 in this language:

"The fixed rule and basic standard by which the validity of all exercise of the police power is tested is that the police power of the state extends only to such measures as are reasonable and that all police regulations must be reasonable under all circumstances. Too much significance cannot be given to the word 'reasonable' in considering the scope of the police power in a constitutional sense, for the test used to determine the constitutionality of the means employed by the legislature is to inquire whether the restrictions it imposes on rights secured to individuals by the Bill of Rights are unreasonable, and not whether it imposes any restrictions on such rights. It has been said that the only limitation upon the exercise of the police power is that such exercise must be reasonable. The validity of a police regulation therefore primarily depends on whether under all the existing circumstances the regulation is reasonable or arbitrary and whether it is really designed to accomplish a purpose properly falling within the scope of the police power."

"While such regulations are subject to judicial scrutiny upon fundamental grounds, yet a considerable latitude of discretion must be accorded to the lawmaking power; and so long as the regulation in question is not shown to be clearly unreasonable and arbitrary, and operates uniformly upon all persons similarly situated in the particular district, the district itself not appearing

1. For those interested in further applications of the police power, attention is directed to Territory v. O'Connor, 1889, 5 Dak. 397, 41 N.W. 746, 3 L.R.A. 355; Nebbia v. New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; State v. Finney, 1944, 65 Idaho 630, 150 P.2d 130; State ex rel. Emery v. Knapp, 1949, 167 Kan. 546, 207 P.2d 440; City of Des Moines v. Manhattan Oil Co., 1921, 193 Iowa 1096, 184 N.W. 823, 23 A.L.R. 1322; Baumann v. Smrha, D.C., 145 F.Supp. 617; Gin S. Chow v. City of Santa Barbara, 1933, 217 Cal. 673, 22 P.2d 5.

Water rights and ground water legislation has been the subject of many law review articles, among them being those in 30 Rocky Mt.L.Rev. 416; 1 Kan.L.Rev. 125; 11 Okla.L.Rev. 26; 22 Mont.L.Rev. 42; 38 N.D.L.Rev. 243 and 42 Neb.L.Rev. 721.

to have been arbitrarily selected, it cannot be judicially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the laws, within the meaning of the 14th Amendment." Reinman v. City of Little Rock, 1915, 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900.

Without intending to cast doubts on the sufficiency thereof, it is observed that the procedural portions of Chapters 430 and 431, Laws of 1955, have not been called into question and are not here before the court.

The rule as to eminent domain is thus epitomized in 29 C.J.S. Eminent Domain § 6, at page 784 thereof:

"Eminent domain takes property because it is useful to the public, while the police power regulates the use of, or impairs rights in, property to prevent detriment to public interest; in the exercise of eminent domain private property is taken for public use and the owner is compensated, while the police power regulates an owner's use and enjoyment of property, or deprives him of it, by destruction, for the public welfare, without compensation other than the sharing of the resulting general benefits. Constitutional provisions against taking private property for public use without just compensation impose no barrier to the proper exercise of the police power."

Being convinced that the legislature was justified in believing that the public welfare requires conservation and preservation of the water supply of the state, that it is not required that irreparable damage be done before action can be taken to conserve and preserve, and that it has not been shown that the regulations adopted are unreasonable or arbitrary, the order of the trial court dismissing such action is affirmed.

BIEGELMEIER, P. J., and RENTTO, HANSON and HOMEYER, JJ., concur.

BANDY, Circuit Judge, sitting for ROBERTS, J., disqualified.