## Fugh Coal Company v. City of Pittsburgh

*Harry Shapera, Morris M. Berger* and *James A. Wright,* for plaintiff.

*Anne X. Alpern,* city solicitor, for defendant.

WEISS, J., May 19, 1949.—This is an action in assumpsit based upon breach of contract. The parties

stipulated to the facts. The court directed a verdict for plaintiff. The city filed its motion for judgment n. o. v., and the matter now comes for disposition before this court en banc.

Reviewing the pleadings and facts as stipulated and agreed between counsel in this proceeding and all reasonable inferences deductible therefrom, favorable to the verdict as consideration of a motion for judgment notwithstanding a verdict procedurally requires, the following is the factual situation (stipulated) basic to the present controversy:

By Ordinance No. 632 of the Council of the City of Pittsburgh, approved December 18, 1940, the appropriate authorities were authorized to advertise for bids for the disposal of incinerator ashes from the municipally operated incinerator.

After proper advertising, plaintiff submitted a proposal for the hauling of ashes from the incinerator plant to either of two sites which the city should direct, and the hauling to the same site of slag for the purpose of covering the ashes in an amount equal to one third of the ashes hauled. Plaintiff's bid was 49 cents per ton of ashes hauled, with no extra compensation for the slag, and his bid was accepted and articles of agreement between him and the city entered into.

By their terms, the articles of agreement took effect January 1, 1941, and terminated on December 31, 1941.

The articles of agreement are silent as to the quantity of ashes to be hauled, but the proposal form signed by plaintiff stated that the bid was "for hauling of an estimated quantity not exceeding sixty-eight thousand (68,000) net tons".

The article stated:

"Scope of Work. It is the intent of the proposed contract to provide that ashes be taken from the ash bin at the Municipal Incinerator Plant at 29th Street and Allegheny River as they accumulate."

The article likewise provided:

"That he (the contractor) knows that various circumstances beyond the control of the Director often affect the operation of the Incinerator Plant which cannot be expected to produce its output at any uniform or predetermined rate."

The article likewise provided:

"If, at any time during the term of this contract, the contractor shall totally or partially fail to remove the ashes from their receptacle at the Incinerator Plant, to such an extent that resulting lack of storage space in the ash receptacle requires stopping the charging of the incinerating plant, then the City may retain the sum of Fifty ($50.00) Dollars for each hour, with fractions of hours at the same rate, for the time during which charging operations were so stopped."

And further, in the same paragraph:

"It is agreed that it is the contractor's responsibility to provide adequate service to keep the ash receptacle at the incinerator plant substantially empty for twenty-four (24) hours per day for seven (7) days per week, and that he shall keep himself informed at all times of the quantity of material to be hauled, and shall provide for adequate truck service accordingly. Any suspension of operation of the Incinerator Plant that is caused by lack of storage space due to failure of the contractor to remove available ashes from the ash receptacle shall be conclusive proof of non-fulfillment of the contract, in each case whereof the foregoing provision for liquidated damage shall become operative."

The articles provided that the contractor would be paid monthly upon the presentation of weight slips for ashes delivered, if the agreed amount of slag had also been delivered; they provided further that the contractor agreed to receive as full compensation the price per unit set forth in the agreement.

The contractor commenced the performance of his contract and from January 1, 1941, until August 22, 1941, hauled varying amounts of ashes per month from the incinerator to the disposal site as is set forth in paragraph 8 of the statement of claim, in a total amount for the period of 53,030 tons. During the period he hauled the entire output of the incinerator plant.

On August 22nd a bill of complaint was filed in common pleas court at no. 1721, October term, 1941, by F. R. Marquis et al. against the City of Pittsburgh, the mayor and the directors of public works and public health. Plaintiffs in this bill were owners of residential property in the vicinity of the disposal sites of the incinerator ash and they averred that the city, by reason of the dumping of such ash, was maintaining a nuisance in the vicinity of their properties, endangering their health and depreciating the value of real estate in the neighborhood. They prayed for a preliminary injunction, to be made permanent after trial. The record of the suit discloses that no preliminary injunction was ordered nor bond filed. The city filed no answer to the bill. Both sides, however, filed requests for findings and conclusions following a hearing. The court, by Kennedy, J., filed its adjudication on December 9, 1941, enjoining permanently defendants from dumping partially burned, singed and scorched garbage, etc., at the site which had been formerly used. The court found in its adjudication that this partially burned vegetable and animal matter threw off foul and offensive odors, was deleterious to plaintiffs' health and destructive of property values in the neighborhood, stating that it was the city's responsibility to treat the refuse so that it would be inert, and further found that there was no complaint about the actual hauling of the refuse.

On August 22, 1941, the day the bill of complaint was filed, plaintiff was ordered to cease his hauling operations under his contract. From that day until the end of the year, the city did its own hauling to another site and during this period hauled from the incinerator in excess of 14,970 tons, which was the difference between the maximum in plaintiff's contract and the number of tons hauled by plaintiff before he was ordered to cease operations.

No additional oral testimony was taken before your opinion writer and the jury, whereupon the court directed a verdict in favor of plaintiff in an amount in which it was agreed between counsel represented the contract price for the additional 14,970 tons at the unit amount of 49 cents per ton, less the actual cost of such hauling. Following a verdict of the jury in favor of plaintiff in the amount of $2,675.10 with interest at four percent from December 31, 1941, defendant filed its motion for judgment n. o. v.

This contract with the city resolves itself into the following

### Questions Involved

1. Where a city, after public advertising, enters into a contract for the period of one year for the hauling of ashes from an incinerator which it operates to sites designated by the city at a unit price per ton of ashes hauled, the contract providing that the contractor should remove the ashes from the incinerator as they accumulate and in default thereof during the term of the contract should be liable for liquidated damages, and where the contract is stated to be for an estimated quantity not exceeding a certain number of tons depending upon the variable output of the incinerator plant, and where the contractor performs the contract for eight and one-half months of the year period, removing during that period all the ashes from the incinerator, at the end of which period, without

fault on his part, he is ordered by the city to cease further operations under the contract, the city thereafter itself hauling from the incinerator for the remaining portion of the contract period an amount of ashes exceeding the balance of the maximum amount of the contract, is the city liable in damages for the contract price of hauling the remaining amount of ashes less the actual cost of such hauling?

2. Where the city orders the contractor to cease operations under his contract because of the filing (by adjacent property owners) of a bill of complaint, seeking to restrain the city from further disposal of treated garbage and refuse at the site which had been selected by the city, and where no order of injunction upon the bill of complaint is entered until the approximate time of termination of the contract of hauling, which order when finally made determined that the city was guilty of creating a nuisance by having dumped at the site garbage and refuse only partially treated by the city, and where the contractor was without blame in his hauling operations, do the above facts relieve the city from its liability on the contract?

## Discussion

I. The contract was binding on the city.

(a) Contract was for entire year.

Plaintiff's proposal was to enter into a contract "for a period not exceeding twelve (12) months and terminating on December 31, 1941". In response to this proposal, the city should have executed an agreement for a period of time less than one year. But this was not done. The formal articles of agreement executed December 30, 1940, by both of the contracting parties state the term of the agreement as follows:

"2B—Term of agreement. It is hereby agreed by both parties hereto that this agreement shall take effect January 1, 1941, and that it shall terminate at the close of December 31, 1941."

The articles of agreement contain no provision for the termination thereof at any earlier date. These articles embody the final commitments of the parties. That they might have agreed to less, consistent with the public advertisement and the bidding, is immaterial. The proposal and other documents expressly made part of the agreement are useful in explaining the agreement and in supplying provisions which it does not contain. They likewise limit the contracting power of the parties both as to time and as to maximum quantities. But within such limitations as are contained in these documents, they cannot make indefinite what the agreement itself expressly makes definite, the one-year term of the contract.

But even were the agreement itself indefinite as to time, the court would seek to fix its term in accordance with "some particular period inferred from the nature and circumstances of the undertaking": Slonaker v. P. G. Publication Co., 338 Pa. 292, 296.

(*b*) Contract was to remove and haul all ashes from incinerator.

Paragraph 3B of the written agreement reads in part as follows:

"3B—Scope of Work—It is the intent of the proposed contract to provide that ashes be taken from the ash bin at the municipal incinerator plant at 29th Street and Allegheny River *as they accumulate, and that the ashes be hauled in trucks to any one or both of the two sites for final disposition* . . .". (Italics supplied.)

This provision must be read in conjunction with the liquidated damage clause (paragraph 15-B) in order that its full significance be appreciated. Therein it is provided:

"If at any time *during the term of this contract*, the contractor shall totally or partially fail to remove the ashes from the receptable at the incinerator plant,—

then the City may retain the sum of Fifty ($50.00) Dollars per hour . . .".

Further quoting from the same paragraph:

"It is agreed that it is the contractor's responsibility to provide adequate service to keep the ash receptacle at the incinerator plant substantially empty for twenty-four (24) hours per day for seven (7) days per week, and that he shall keep himself informed at all times of the quantity of material to be hauled, and shall provide for adequate truck service accordingly."

It is clear that the contractor is obligated under these provisions to keep himself personally cognizant from day to day of the quantity of ashes in the incinerator, and promptly remove and haul them to the designated disposal site. He cannot wait for the orders of the director of public works or his subordinates. The authority of the director is not present in this phase of the undertaking. The contractor is visited with the personal responsibility of keeping the incinerator empty. *If he had neglected this obligation, regardless of the presence or absence of fault on his part, he would have been automatically subjected to the payment of heavy damages.*

Since the contractor has thus obligated himself to remove and haul all of the ashes from the plant during the contract year, what is the corresponding obligation of the city? Under paragraphs 16B and 17B, it must make monthly settlements with the contractor on the basis of verified weight slips for all the ashes so hauled. Furthermore, it cannot prevent the contractor from performing these obligations, and thus relieve itself from payment of the contract price, for it, as well as the contractor, has agreed that the latter should, during the term of the contract, remove all of the ashes from the plant as they accumulate.

Moreover, the contractor, with the assent of the city, did remove all of the ashes as they accumulated and did

haul them away, during that portion of the contract period in which he was permitted to operate. Thus the parties themselves have by their conduct subsequent to the contract placed an interpretation on its provisions which is consistent with our contention. Such interpretation by the parties themselves is strongly persuasive of their intent at the time of contracting. This principle was affirmed in a convincing and comprehensive opinion of Judge Levinthal of the Philadelphia common pleas court in the case of Philadelphia v. Philadelphia Transportation Co., 345 Pa. 244 at 257.

(c) The city could not terminate or cancel the contract.

As has been stated, the articles of agreement contain no express provision which would permit either party to cancel or terminate the contract until the expiration date provided therein. Neither are there any provisions in the articles from which such right of interim cancellation could be implied. The proposal and the agreement contain the phrases "as designated" and "as required by the director". A glance at the context of these phrases clearly shows that their application is limited to a choice of the site for dumping ashes and slag. In the proposal, contractor agrees to haul ashes and slag "in strict accordance with the instructions of the Director—". Whatever authority is conveyed by this phrase must be confined to the direction and supervision of the manner of performance; it cannot be construed to vest in the director the power to change the provisions of the contract, much less to cancel it completely. Such construction would work a forfeiture of rights otherwise granted by the contract, and is abhorrent to the law. This principle was upheld with distinct clarity in the case of Hild v. Dunn, 310 Pa. 289, in which Mr. Justice Simpson said at page 293:

"Inasmuch as paragraph six, if construed as contended for by plaintiff, would result in taking from de-

fendant the right to pay in installments, which is clearly given in another paragraph, it is in the nature of a forfeiture, and must be so construed as not to have that meaning if, on a consideration of all the facts and circumstances, a substantial doubt exists as to this having been the intention of the parties: . . . McCalla's Est., 16 Pa. Superior Ct. 202, 205."

But what construction should be given to the phrase in the proposal "For the hauling of an estimated quantity not exceeding 68,000 net tons". Can it be contended that because of this indefiniteness as to quantity, the city did not bind itself to pay for any specified volume of ashes except perhaps for that which might subsequently be hauled?

This phrase does not occur in the articles of agreement. The articles do not mention quantities. They do however, as we have seen, obligate the city to compensate the contractor at the contract rate for all of the ashes to be produced in the incinerator during the contract year. This is a definite commitment, in no way uncertain as to amount, and cures whatever indefiniteness there might be as to numerical quantities. (We conceded however at the trial, and now reiterate, that the maximum of 68,000 net tons places a ceiling on the quantity of ashes for the hauling of which the contractor is entitled to payment, and that he is entitled to compensation for this amount, only for the reason that the incinerator produced 68,000 tons or more of ashes during the year 1941).

But even if the articles of agreement, as well as the proposal, had provided that the contractor should haul an estimated amount, he would, nevertheless, because of the other contract provisions discussed herein, be entitled to recover for the entire output of the incinerator for the year *subject to the limitation of 68,000 tons.* Since it is clearly established that the contract comprehends the disposal of all of the ashes from the plant for

the period of a year, the phrase in question has no significance.

Counsel for plaintiff cites the cases of National Building Supply Co. v. Baltimore, 100 Md. 188, 59 Atl. 726; Thurber et al. v. Ryan et al., 12 Kan. 453, and Tancred Arrol & Co. v. The Steel Company of Scotland, 15 App. Cas. 125 (LR1890), which we believe directly applicable to the instant adjudication.

In the case of National Building Supply Co. v. Baltimore, 100 Md. 188, 59 Atl. 726, where the contractor agreed to supply all the cement needed by the City of Baltimore during the year in an estimated amount of 5,000 barrels, he was required to furnish cement in excess of the estimate, sufficient to satisfy the city's needs.

In the case of Thurber v. Ryan, 12 Kan. 453, a contract to deliver 600 cords of stone more or less, sufficient for the erection and construction of a courthouse, was construed as fixing the contractual quantity in accordance with the requirements of the job, rather than with the estimate. And in Tancred Arrol & Co. v. The Steel Company of Scotland, 15 App. Cas. 125 (LR-1890), a contract to supply "the whole steel" required for the Forth Bridge, which estimated the required quantity at 30,000 tons, was held to entitle the contractor to furnish the entire requirements of the bridge, even though such requirements were in excess of the estimated quantity.

Applying the same principle to the instant case, the quantity contracted for in the present case, although not precisely stated in the agreement, is reduced to certainty by reference to the requirements of the project, whose needs it is designed to serve.

It would have been impossible in the agreement in litigation to have fixed the precise quantity of ash which it was contemplated that plaintiff should haul. In paragraph 11B of the articles. it is brought to the

contractor's attention that "various circumstances beyond the control of the Director often affect the operation of the incinerator plant which cannot be expected to produce its output at any uniform or any predetermined rate,—". This variation in output which had been foreseen by the contracting parties actually occurred in the operation of the plant during the ensuing year. There was no uniformity in the amount removed each month by the contractor. The phrase in the proposal "estimated quantity" must be read in the light of these facts.

That the contract cannot be construed so as to permit a premature cancellation is obvious to this court upon analysis. If the city was within its rights in cancelling in August, it must have had the same right to do so on January 1st, before plaintiff had done any hauling. The right to prevent any further hauling in August would imply the right to prevent performance at the inception of the contract. *Such authority over municipal contracts would make a mockery of public bidding, and would permit widespread favoritism and fraud.* This construction would void the entire contract for lack of mutuality, for the city would have made no binding commitment, and would have incurred no binding obligation. The contract would therefore be inoperative as to either party: A. L. I. Restatement of the Law of Contracts, §79, examples 1 and 3.

It is a commonplace of construction that contracting parties are presumed *not* to have contemplated either vain or invalid agreements.

Township of Mt. Lebanon v. Metropolitan Casualty Ins. Co. of New York, 106 Pa. Superior Ct. 209, 215: "It is a common sense rule of construction to interpret contracts so as to give them life and force."

Levin v. Fidelity-Philadelphia Trust Company, trustee et al., 358 Pa. 124, 128: "Intention to effect an

absurd result will never be imputed to the parties to a contract."

Moran v. Bair, 304 Pa. 471, 475:

"As a matter of law, contracts should be interpreted so that agreements as a whole may be carried into effect. If possible, no part of a contract should be disregarded or treated as a nullity or a redundancy."

But a construction which would permit cancellation is likewise to be avoided because of the unfairness and hardship which it would visit upon the contractor. No testimony was taken upon this point, but the magnitude of this undertaking obviously required the procurement and maintenance by the contractor of a large number of trucks, as well as the withholding of them from other gainful work. It is not reasonable that the contracting parties contemplated that this investment should be imperilled because of arbitrary cancellation of the agreement by the city.

Wiegand v. Wiegand, 349 Pa. 517, 520:

"We should adopt that interpretation which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties."

Percy A. Brown & Co. v. Raub et al., 357 Pa. 271, 287:

" 'Where the language of a contract is contradictory, obscure, or ambiguous, or where its meaning is doubtful, so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred. If one construction would make it unreasonable, while another would do justice to both parties, the latter will be adopted' " (6 R. C. L. 841, sec. 230).

Smith et al. v. Stricker, 123 Pa. Superior Ct. 181, 190:

"Even when two constructions are warranted by the wording of a contract or law and one would work a wrong or result in the doing of an injustice and the other would be fair and equitable, the one should be adopted which comports with justness, fairness and equality."

The modern tendency of the law is away from technical construction of contracts and toward an effort to enforce the underlying intent of the parties.

Douglass v. Queeney, Jr., et ux., 109 Pa. Superior Ct. 336, 342:

"Whatever may have been the earlier doctrine, it is now thoroughly settled that technical rules of construction are not favored, and should not be applied so as to defeat the fair intention of the parties."

Hempfield Township School District v. Cavalier et al., 309 Pa. 460, 464: " 'Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent.' 13 C. J., page 521, section 482."

*This court is convinced that the city, therefore, as well as the contractor, entered into a binding obligation for the hauling of all of its ashes for the entire year, and neither party by explicit provision nor by any imlication gained from the contract itself or from its surrounding circumstances, retained the right to cancel it prematurely. Any other conclusion would do violence to the terms of the contract, would render it inoperative as lacking in mutuality and would be entirely unreasonable and unconscionable.*

II. The filing of the bill did not justify the breach.

(*a*) There was no order of court at the time of breach.

Under certain circumstances, the decree of a court of equity restraining one of the contracting parties from proceeding with a contract, will excuse it from liability to the other party.

Thus in the case of Olyphant Borough School District v. American Surety Co., 322 Pa. 22, there was involved the failure to collect taxes by a tax collector who, without fault on his part, had been removed from office by quo warranto proceedings. Suit was entered against his surety. Mr. Justice Barnes, speaking for the court in that case, said:

"It is a fundamental principle that where the performance of a contract is prevented, *without fault on the part of the promisor*, by a proper judicial order, the obligation to perform is discharged: Restatement, Contracts, section 458; see Monaca Boro. v. M. & A. St. Ry. Co., 247 Pa. 242; 3 Williston, Contracts, section 1939."

The above cited section of the A. L. I. Restatement reads as follows:

"A contractual duty or a duty to make compensation is discharged, in the absence of circumstances showing either a contrary intention or *contributing fault* on the part of the person subject to the duty, where performance is subsequently prevented or prohibited.

"(b) By a judicial, executive or administrative *order* made with due authority by a Judge or other officer of the United States, or of any one of the United States." (Italics supplied)

But no authority exists for the proposition that the mere filing of an action in equity against a contracting party justifies his rescission of a contract with a third person. Merely to state such a proposition is to expose its folly. A contract would be of little value if it should lose its binding effect merely because of the entry of a suit which might be either *baseless* or *even collusive*. The allegations of a bill represent merely the contentions of one party. Until passed upon by a court, in this case by a chancellor, they obviously have no determinative character at all. Clearly the city, performing as it was a public function and bound in its perform-

ance by a solemn contract, let after the formality of advertising and public bidding, was bound to test the validity of this bill before it should be relieved from its commitment.

Such a test was immediately available. The bill prayed for a preliminary injunction. *Either side might have pressed for a hearing at once on this issue.* The city might have appealed had an injunction been granted. But no such action was taken by the city. Plaintiff herein was immediately ordered to cease his operations under the contract, the city, with its own personnel, took over the hauling to another site, and the equity action was allowed to remain open from August to December. When a decree was finally entered, the contract period had almost expired. In thus repudiating its contract with Fugh because of the unproven averments of the bill, without the interposition of a binding order by the court, the city breached its contract.

(*b*) City's duty to resist the injunction.

We believe it was the city's duty to resist the injunction. A. L. I. Restatement of the Law of Contracts, §458, which is the authority for the discharge of contracts by reason of a prohibitory order of court, cites in example thereto a situation wherein defendant failed to diligently resist the obtaining of an injunction. Under such circumstances, it is therein stated that defendant would not be discharged from its contract obligation.

*The city failed to contest the equity action in any manner which would have protected the contractor. It filed no answer, it sought no hearing on the preliminary injunction.* Instead, it immediately repudiated its contract with Fugh, and ordered him to cease operations. What later steps the city took in the equity action, in participating in a hearing and in filing requests for findings and conclusions, were of no avail to the contractor. He had been ordered off the job, and was never

later invited to resume his operations. The real explanation for the passive position taken by the city when the bill was filed is perhaps contained under the next subheading.

(c) The city was not without fault.

It will be recalled that the Olyphant School District case, supra, stated that a promisor would be excused from performance of his contract obligation by a decree of injunction, only if the promisor was himself without fault. Section 458 of the A. L. I. Restatement, relied upon in the Olyphant opinion, contains a similar provision "in the absence of circumstances showing—contributing fault on the part of the person subject to the duty." Under this section, several illustrative examples are given, one of which, example 3, presents a situation wherein plaintiff in the equity proceeding had just grounds for obtaining the injunction, with the result that the contracting party was not excused from his obligation.

It has been judicially determined in the equity proceeding relied upon by the city to excuse its breach with Fugh, that plaintiffs in said proceeding had a good cause of action and that the city was at fault. It was the city that had reduced the garbage to ashes and the city that had designated the disposal site. The contractor participated in neither of these two actions which were complained of in the bill.

The chancellor in his adjudication found that the reduction by the city of the garbage to ash had not been complete, in spite of its duty to so treat the garbage as to render it inert. He found that such partially treated garbage threw off, foul and offensive odors, that it attracted rodents and insects, was injurious to the health and destructive of the value of properties of adjoining residents. These findings were unappealed from, and are res adjudicata.

No suggestion is made of moral culpability on the part of the city, which had an urgent and difficult task to perform in its disposal of the city's garbage. But the fact remains that the city so handled this task both in its choice of a disposal site and its manner of treating garbage as to create and maintain a nuisance in the vicinity of Highland Park, and that the chancellor so found in his adjudication. It cannot be said therefore, either, that plaintiffs in equity had not a just cause, nor that the city was without contributing fault. We have seen that in such circumstances, the injunction does not excuse the breach of contract.

The authorities in our Commonwealth support this position:

. In the case of Bradley v. McHale, 19 Pa. Superior Ct. 300, defendant had agreed to move a house to plaintiff's lot, but was unable to do so when the borough and the telegraph company refused him permission to cross the streets and disturb the wires. It was held that he was not excused from performance, the court stating in its opinion:

"He cannot escape liability because he misjudged his ability to perform his written contract: '. . . He should have taken that into consideration when he made the contract.'"

The case of Sauer v. School District of The Borough of McKees Rocks, 243 Pa. 294, involves a fact situation wherein plaintiff, an architect, had a contract to prepare plans for and supervise the construction of a school building. Before the building was completed, the school board was enjoined from continuing the construction because the legal bonded debt had been exceeded. In permitting recovery, the court stated (p. 303):

"Where an agreement is lawful on its face or is capable of being executed in a lawful way, and the intention of one of the parties is that it be so executed, he

is entitled to enforce it notwithstanding the other party intended an illegal act, if he was unaware of the illegal intention: 9 Cyc. 570."

Finally, the case of J. H. Harlow v. The Beaver Falls Borough, 188 Pa. 263, involved a suit by a consulting engineer for compensation for the preparation of plans of a borough water works, where a company already holding a contract for the servicing of water to the borough obtained an injunction against the borough forbidding further construction of the municipal project. Recovery was permitted by the engineer despite the injunction obtained by the water company.

*All of these cases* present situations wherein a contract innocently entered into by one party cannot be completed because such completion would involve a violation of the law by the other party. *In all of these cases,* the second party was responsible at least in part for the situation which was successfully protested by strangers to the contract. *In all of the cases cited, a recovery was allowed the innocent party to the contract. No difference in principle exists between the cited cases and the case before this court.*

We are in accord, therefore, that the filing of the bill of complaint against the city by residents of properties adjoining the disposal site affords no defense to the city in this action.

## Conclusion

Since the parties entered into a binding contract for the disposal of all of the incinerator ash for the period of one year, and since the city breached its contract with no legal justification therefor, plaintiff is entitled to damages for such breach. The measure of damages was agreed upon at trial as the net profit or as was stipulated to be the unpaid amount of the contract price less the cost of completing the contract. This is in accord with the rule as to damages established by our decisions: Sauer v. School District of the

Borough of McKees Rocks, 243 Pa. 294; Altman, for use of Trust, v. School District of City of Uniontown, 334 Pa. 336.

The verdict of the jury reflects this formula reduced to dollars and cents by agreement of counsel. Deducted from the contract price is the cost of hauling both the ashes and the slag. There is no reason in law or in justice why such verdict should be disturbed.

Correctly applying the principle of law pertinent to the facts of the case as found most favorably to plaintiff, defendants' motion for judgment n. o. v. is hereby refused.