## Philadelphia v. Philadelphia Transportation Company, Appellant.

Argued May 25, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

The facts are stated in the opinion of the court below by LEVINTHAL, J., as follows:

Seeking in this action in assumpsit to recover the sum of $17,150.00 with interest on account of unpaid license fees for the year commencing July 1, 1940, on motor buses operated by the defendant, Philadelphia

Transportation Company, the plaintiff, City of Philadelphia, has filed this rule against the defendant for judgment for want of a sufficient affidavit of defense.

The facts disclosed by the pleadings are as follows: In 1902, defendant's predecessor, the Philadelphia Rapid Transit Company (hereinafter called "P. R. T.") was incorporated under the Act of March 22, 1887, P. L. 8, as a street railway company, and, until the year 1940, operated a system of street passenger railway lines in the City of Philadelphia and vicinity. On July 1, 1907, an agreement was entered into between the City and P. R. T. fixing, *inter alia,* the financial obligations of the latter to the city. The contract states, in part:

"WHEREAS, Beginning about the year 1857 different companies to the number of upwards of fifty, incorporated by the Commonwealth of Pennsylvania, have been granted consent by the City to occupy various streets of the city for the purpose of transporting passengers from point to point along the same, which franchises and consents have been granted subject to various conditions and restrictions;

"AND WHEREAS, These companies were subsequently leased for long terms of years by traction or motor-power companies, which have installed the electrical system of propulsion of cars, all of which leases have now, by assignments and various conveyances, become vested in the Company, which thus controls and operates as one general system practically all of the street passenger railway companies in the City of Philadelphia;

"AND WHEREAS, The Company has also acquired through stock ownership and leases control of all the franchises which have been granted for the construction of elevated and underground passenger railways within the city and has under construction in partial operation an elevated and underground railway from the western end of Market Street along Market Street to Delaware Avenue, and also has franchises for the construction of a subway on Broad Street and an elevated railway to Frankford;

"AND WHEREAS, The terms, conditions, restrictions and liabilities which have been imposed upon these various companies (all of which shall be taken as included in the words 'subsidiary companies' wherever the same are hereinafter used) differ widely, and there is dispute and uncertainty with respect to the effect of many of the provisions thereof, and it is believed that it is to the interest of the public as well as of the parties hereto to supersede the former regulations, and to define and regulate the relations between the parties hereto so as to make them fixed, fair and uniform; . . .

"AND WHEREAS, It is desirable that arrangements should be made requiring the direct payment into the City Treasury of a fixed sum in lieu of a license fee per car, and a further sum to represent the cost of maintaining street pavements and caring for the streets occupied by passenger railway tracks, in order to enable the City to have control of this municipal work. . . .

". . . it is covenanted and agreed between the parties hereto, as follows:

"*Tenth.* The Company (P. R. T.) shall, in addition to the other payments herein provided for, (pay into the City Treasury sums ranging from $500,000 annually for the first ten year term to $700,000 annually for the fifth such term) . . . which payments, when made, shall be in lieu and satisfaction of all obligations and liability on the part of the Company, and its subsidiary companies, for the paving, repaving and repair of the streets occupied by their surface lines, the obligation of the companies with respect to the removal of snow therefrom, and all license fees with respect to the cars run upon the said streets or over the various city bridges or the system of operating said cars, and shall be in lieu of the right of the City hereafter to impose upon the Company, or its subsidiary companies, similar obligations or charges; . . . Nothing herein contained is intended to relieve the Company, or its subsidiary companies, from taxation upon any class of real estate now taxable, nor

from taxation on dividends as provided in their respective charters, nor to affect the matters for which special provision has been made in this contract. To such extent, however, as taxes and assessments not upon such real estate or dividends may hereafter be imposed upon the Company for the benefit of the City, the City shall credit upon the taxes that may thus be hereafter imposed all payments made hereunder as well also as the sums which shall be divided with and paid to the City out of earnings as provided for in Clause 6. *Provided, however,* That nothing herein contained shall relieve the Company from the obligation to replace or repair pavement removed or damaged by any construction or repair work which the Company may undertake with reference to its tracks or conduits."

In 1923, P. R. T. caused the formation of a motor bus company known as the Philadelphia Rural Transit Company (hereinafter called "Rural Transit"). P. R. T. became the owner of all of the bus company's stock and it is agreed that Rural Transit, in the ordinary business sense, was a subsidiary of P. R. T. Commencing with the ordinance of June 16, 1924, numerous ordinances were enacted authorizing Rural Transit to operate its motor buses on various designated routes in the City of Philadelphia. These ordinances, which were accepted by Rural Transit, provided: "That if at any time a tax or license fee shall be imposed upon motor busses for public use in the carriage of passengers for pay upon any of the streets, avenues, bridges, highways, boulevards or public places wholly or in part within such City, such tax or license fee shall apply to the company's vehicles. . . ." On June 24, 1924, such an ordinance was passed providing for the licensing of motor buses and fixing a license fee of fifty dollars ($50.00) per vehicle.

From 1924 until 1940, operating its buses in Philadelphia and vicinity by virtue of certificates of public convenience issued by the Pennsylvania Public Utility Commission and pursuant to the aforementioned city

ordinances, Rural Transit continually recognized its obligation under the licensing ordinance and paid to the City an annual fee of fifty dollars for each bus operated within the City.

For several years prior to 1940, the business and property of P. R. T. was under the jurisdiction of the United States District Court for the Eastern District of Pennsylvania in corporate reorganization proceedings under the former Section 77$B$ of the National Bankruptcy Act. Pursuant to the approved plan of reorganization, Rural Transit was acquired and merged into P. R. T.; and, immediately thereafter, P. R. T. merged with various other transportation companies to form the defendant, Philadelphia Transportation Company (hereinafter called "P. T. C."). By an ordinance of May 20, 1939, the City gave its consent to the plan of reorganization and on June 12, 1939, entered into a supplementary agreement with P. R. T. amending the agreement of July 1, 1907, but leaving intact the provisions relevant herein. The defendant, P. T. C., became the assignee of all the rights, privileges, liabilities and duties of P. R. T. under the Agreement of 1907, as amended.

Since January 1, 1940, the defendant has been engaged in the transportation of passengers for hire both by trolley cars and motor buses in the City of Philadelphia. It has, accordingly, made application to the Department of Public Safety for licenses to operate three hundred and forty-three of its motor buses, which licenses have been prepared and tendered to it. P. T. C., however, has refused to pay the sum of $17,500.00 (the aggregate license fees for the year beginning July 1, 1940), or any other sum to the City for license fees, on the ground that the fixed annual payments made to the City under Paragraph 10 of the Agreement of 1907, among other things, are in lieu of any license fees on motor buses when such passenger vehicles are operated by P. T. C. itself. The validity of the foregoing contention is the question before us on the instant rule for judgment.

P. T. C.'s defense to the payment of the license fees involved is predicated upon two provisions of Paragraph 10 of the 1907 agreement which we shall consider separately.

I. First, there is the provision that the fixed annual payments previously mentioned, "when made, shall be *in lieu and satisfaction of all obligations and liability on the part of the Company, and its subsidiary companies, for* the paving, repaving and repair of the streets occupied by their surface lines, the obligation of the companies with respect to the removal of snow therefrom, and *all license fees with respect to the cars run upon the said street, or over the various city bridges or the system of operating said cars,* and shall be *in lieu of the right of the City hereafter to impose upon the Company, or its subsidiary companies, similar obligations or charges . . .*". (Italics supplied.)

In interpreting the foregoing provision, five principles of construction should be kept in mind. The first is that the entire contract should be read as a whole and every part interpreted with reference to the whole, so as to give effect to its true purpose: *McMillin v. Titus,* 222 Pa. 500, 502 (1909); *Nusbaum v. Hartford Fire Ins. Co.,* 276 Pa. 526, 531 (1923); *Harrity v. Continental-Equitable Title & Trust Co.,* 280 Pa. 237, 241 (1924). The second is that "the contract itself must be read in the light of the circumstances under which it was made" and that it is necessary to "consider the situation of the parties at that time, the necessities for which they naturally provided, the advantages each probably sought to secure and the relation of the properties and rights in regard to which they negotiated.": *Baseman v. Shell Union Oil Corp.,* 138 Pa. Superior Ct. 512, 516 (1939); see also *Williamsport National Bank v. First National Bank,* 334 Pa. 130, 135 (1939); *Smith's Estate,* 338 Pa. 258, 262 (1940). The third is that where a public interest is affected, an interpretation is preferred which favors the public: See *Restatement of Contracts,* Sec.

236 (f); *Mayor of Allegheny v. Ohio and Pennsylvania R. R.*, 26 Pa. 355, 360 (1855); *Johnson v. Philadelphia*, 60 Pa. 445, 451 (1869); *Junction Passenger Ry. v. Williamsport Passenger Ry.*, 154 Pa. 116, 127 (1893). The fourth is that specific provisions ordinarily will be regarded as qualifying the meaning of broad general words in relation to a particular subject: *First Nat'l Bank of East Conemaugh v. Davies*, 315 Pa. 59, 63 (1934); *Real Estate-Land Title & Trust Co. v. Bankers Trust Co.*, 104 Pa. Superior Ct. 493, 495 (1931). And the fifth is that, unless contrary to the plain meaning of the contract, an interpretation given by the parties themselves will be favored: *Baker's Trust Estate*, 333 Pa. 273, 276 (1939); *Armstrong v. Standard Ice Co.*, 129 Pa. Superior Ct. 207, 213 (1937); *O'Neill v. Atlas Automobile Finance Corp.*, 139 Pa. Superior Ct. 346, 354 (1939).

An examination of the various provisions of the Agreement of 1907 reveals that it was intended to govern the relations and respective interests of the City and a *street passenger railway* company, namely, P. R.T., which had by then acquired control of the city's transit system. The entire contract relates to this *street railway system*. Thus, the contract recites the formation of the early street railway and traction companies, the installation of the "electrical system of propulsion of cars", the consolidation of these "street passenger railway companies" into one general system under P. R. T., and the latter's acquisition of control of all the franchises then granted "for the construction of elevated and underground passenger railways". Various other portions of the contract speak of the maintenace of the streets occupied by "passenger railway tracks", the construction of "new lines of surface, elevated or underground railway", the company's "trolley system" and the like. It is significant that there is not a single reference in the entire contract to the future contingency of passenger transportation by gasoline propelled motor buses or the like. In fact, the amendatory agreement of June 12,

1939, refers to the Agreement of 1907, as "The contract made July 1, 1907, between City and Company, affecting, fixing and regulating the duties, powers, rights and liabilities of the City and of the Company, and its subsidiary companies, and the relations and respective interests of the contracting parties, *providing for the future management and extension of the street railway system controlled by the Company, and the final acquisition of its leaseholds and property by the City.*" (Italics supplied.)

That such should have been the content of the 1907 agreement is easily understandable from the circumstances under which it was made. Passenger transportation by motor bus, as we now know it, was then still a theory. More significantly, it is admitted in the brief of the defendant that "at the time of the making of the Agreement of 1907, neither Philadelphia Rapid Transit Company nor any of its 'subsidiary companies', as defined in that Agreement, had the corporate power to operate motor buses, nor could such a power be enjoyed either by a street railway company or traction or motor power company under the statutes then applicable to such corporations". P. R. T. itself was incorporated under the Act of March 22, 1887, P. L. 8, as amended, entitled "An Act to provide for the incorporation and regulation of motor power companies for operating passenger railways by cables, electrical or other means". It never acquired the corporate power to operate a system of motor buses and not until 1924 did it enter this field of transportation through its wholly owned subsidiary, Rural Transit.

Moreover, in view of the circumstances that the provisions of Paragraph 10 fixing the annual payments, *inter alia,* as in lieu of all license fees on "cars," was drawn up at a time when P. R. T. and its "subsidiaries" operated only railway cars, by trolley or cable, and considering, in particular, the greatly increased amount of municipal services necessitated by the formation of

passenger bus lines throughout the city and the correspondingly increased costs of the City's regulation thereof under its police powers, to meet which expenditures the license fees were imposed, it is apparent that the public interest will be adversely affected by a broad interpretation of the contract in favor of the defendant.

In view of the foregoing, we have no hesitancy in holding that the clause "all license fees with respect to cars run upon the said streets or over the various City bridges or the system of operating such cars" refers solely to street passenger railway cars or trolley cars and not to motor buses which are not limited to any given area but may operate over the entire cartway of the street.[1] Likewise, having regard to the fourth rule of construction, *supra,* the broad provision immediately following, namely, that the fixed annual payments "shall be in lieu of the right of the City hereafter to impose upon the Company, or its subsidiary companies, similar obligations or charges," must be restricted in its application to the general subject-matter to which the preceding specific clauses have reference, in other words, the similar obligations and charges incident to the operation of a street passenger railway system.

Lastly, in this connection, it is to be observed that from 1924 until 1940, Rural Transit, a wholly owned subsidiary of P. R. T., paid the bus license fees herein involved pursuant to the several ordinances, which it had accepted, authorizing it to operate its buses over various designated routes in the City of Philadelphia on condition that it pay any license fees imposed upon such vehicles. During this period, neither it nor its parent corporation, P. R. T., sought to invoke the benefits of the Agreement of 1907 against the exaction. It is, threfore, plaintiff's contention that the defendant's predecessor long has acted in accordance with the inter-

---

[1] The word "car" is now commonly employed as a synonym for "automobile" but it is doubtful if it was in such use in 1907. Even today, it is extremely rare that a "bus" is referred to as a "car."

pretation of the contract proffered by the City and that this interpretation thus accepted by the parties themselves should be favored in the instant proceeding. Defendant argues, however, that while Rural Transit was a subsidiary of P. R. T. in the ordinary business sense, it did not come within the phrase "subsidiary companies" as defined in the Agreement of 1907, namely, those various passenger railway companies whose franchises had come under the control of P. R. T. Consequently, it is urged, Rural Transit could not seek the benefits of the contract. But when P. T. C., P. R. T.'s assignee, acquired the bus lines and operated them itself, defendant contends, Paragraph 10 of the agreement was then rendered applicable. The contract does recite that the various older street railway companies "shall be taken as *included in* the words 'subsidiary companies' whenever the same are hereinafter used." (Italics supplied.) However, the fact that these designated companies are "included in" the definition does not necessarily mean that other companies, subsidiaries in the ordinary business sense, are correspondingly excluded. The Ordinances of City Council under which Rural Transit operated its buses provide, in part:

*"It is agreed that the Philadelphia Rural Transit Company is a subsidiary of the Philadelphia Rapid Transit Company, within the meaning of the agreement of July 7, 1907, between the City of Philadelphia and the Philadelphia Rapid Transit Company,* and it is further expressly agreed that the earnings of the Philadelphia Rural Transit Company, accruing directly or indirectly to the Philadelphia Rapid Transit Company, shall be available for and applicable to the payments to be made to the said City under the provisions for the recapture of profits, contained in paragraph sixth of the said agreement of July 1, 1907. And it is further agreed that in any investigation of the fares and income of the Philadelphia Rapid Transit Company, or upon any application for readjustment of the fares of the Philadelphia Rapid Transit Company, such investigation or applica-

tion shall include the fares and income of the Philadelphia Rural Transit Company as a part of the system of the Philadelphia Rapid Transit Company." (Italics supplied.)

Defendant's suggestion that the provision quoted above means merely "that for purposes of profit-sharing and rate cases that Company (Rural Transit) should be treated as a subsidiary of Philadelphia Rapid Transit Company", does not appear entirely acceptable. If Rural Transit was a subsidiary company within the meaning of the 1907 agreement, and there are grounds for viewing its status as such, then the interpretation placed upon the contract by the acts of the parties over a long period of years should be preferred in the present proceeding. However, it is unnecessary for us to rule upon this phase of the controversy in view of our previous conclusion that, aside from the interpretation which the parties subsequently may have given it, the provision of the Agreement of 1907 now under consideration actually related to license fees on street railway cars or trolley cars only and not to those on vehicles such as motor buses.

II. Defendant also relies on that portion of Paragraph 10 which reads as follows: "Nothing herein contained is intended to relieve the Company, or its subsidiary companies, from taxation upon any class of real estate now taxable, nor from taxation on dividends as provided in their respective charters, nor to affect the matters for which special provision has been made in this contract. *To such extent, however, as taxes and assessments not upon such real estate or dividends may hereafter be imposed upon the Company for the benefit of the City, the City shall credit upon the taxes that may thus be hereafter imposed all payments made hereunder* as well also as the sums which shall be divided with and paid to the City out of earnings as provided for in Clause 6. *Provided, however,* That nothing herein contained shall relieve the Company from the obligation to replace or repair pavement removed or damaged by any construction or repair work which the Company may

undertake with reference to its tracks or conduits."
(Italics supplied.) It is the defendant's contention that
the license fees involved are "taxes" or "assessments"
upon which the fixed annual payments must be credited.

With this we cannot agree. In the case of *American
Motor Coach System v. City of Philadelphia,* 28 F.(2d)
736 (C. C. A. 3d, 1928), it was pointed out that the li-
cense fee imposed by the Ordinance of June 24, 1924, is
not an excise tax but merely a fee by which the City
seeks reimbursement for the administrative expenses
incurred in the licensing of buses and their operators
and the enforcement of its safety regulations upon the
streets. The Court notes (p. 740) : "At the time of pass-
ing the ordinance, the city estimated the total expense of
policemen and other members of the department of pub-
lic safety assigned to the inspection and supervision of
the operation, the purchase of the necessary filing equip-
ment, the printing of the necessary forms, the.purchase
of tags and the payment of necessary clerk hire. The
total estimated expense divided by the total number of
buses, interstate and intrastate, gave the quotient or
amount necessary to charge each bus to defray the ex-
penses for the inspection, supervision and administra-
tion of the act. The result showed that about $50 per
bus would be necessary to pay the expenses made neces-
sary by the operation of the buses on the city streets
. . . it is evident that $50 per bus is a very reasonable
license fee and the passage of the ordinance establishing
the regulations and requiring the license fee was a rea-
sonable exercise of the municipal police power delegated
by the commonwealth."

Nor does the instant fee constitute an "assessment"
under the agreement. In matters of taxation other than
those concerned with valuation, the word "assessment"
is generally used to designate "the amount to be paid
into the public treasury as a part of the benefit specially
received by reason of some local improvement": *Boston
Asylum and Farm School, etc., v. Street Commissioners*

*of Boston,* 180 Mass. 485, 486 62 N. E. 961, 962 (1902) ; *Louisiana Central Lumber Co. v. Catahoula Parish School Board,* 191 La. 470, 479, 185 So. 885, 888 (1938). For example, such are the charges imposed for the installation of sewers, water pipes, paving, sidewalks, curbs and the like. As distinguished from the ordinary tax, it is not an annual or recurring imposition. In the present case, the distinction between license fees, taxes and assessments clearly appears in Paragraph 10 of the Agreement of 1907 and each class of charge is specifically referred to therein in its proper connection. Briefly, we do not believe that the latter provision of Paragraph 10 can be set up as a valid defense to the payment of the license fees sought.

It is our opinion that there is nothing in the Agreement of 1907 or its amendments which would deprive the City of its right to the license fees on the motor buses operated by the defendant, Philadelphia Transportation Company.

*Frederic L. Ballard,* with him *Boyd Lee Spahr, Jr., John V. Lovitt, Allen Hunter White* and *Ballard, Spahr, Andrews & Ingersoll,* for appellant.

*G. Coe Farrier,* Assistant City Solicitor, with him *Ernest Lowengrund,* Acting City Solicitor, for appellee.

PER CURIAM, June 29, 1942:
All that need be said in disposing of this case is contained in the comprehensive and convincing opinion of Judge LEVINTHAL. Upon that opinion the judgment of the court below, entered for want of a sufficient affidavit of defense, will be affirmed.

Judgment affirmed.