534 A.2d 1130

Commonwealth of Pennsylvania, Department of Environmental Resources and Elwood D. Yoder, Sherry Yoder, Bruce L. Yoder and Dorothy C. Yoder *v.* PBS Coals, Inc., and Fetterolf Mining, Inc. PBS Coals, Inc., Appellant.

Commonwealth of Pennsylvania, Department of Environmental Resources and Elwood D. Yoder, Sherry Yoder, and Bruce Yoder *v.* PBS Coals, Inc., and Fetterolf Mining, Inc. Fetterolf Mining, Inc., Appellant.

Argued March 23, 1987, before Judges CRAIG and DOYLE, and Senior Judge NARICK, sitting as a panel of three.

*John J. Dirienzo, Jr., Fike, Cascio & Boose,* for appellant, PBS Coals, Inc.

*Gilbert E. Caroff,* for appellant, Fetterolf Mining, Inc.

*Michael E. Arch,* Assistant Counsel, with him, *Ward T. Kelsey,* Assistant Counsel, for appellee, Commonwealth of Pennsylvania, Department of Environmental Resources.

*John E. Childe, Jr.,* for appellees, Elwood D. Yoder, et al.

OPINION BY SENIOR JUDGE NARICK, December 15, 1987:

This consolidated equity action was brought by the Department of Environmental Resources (DER) to compel two coal mining companies, PBS Coals, Inc. (PBS) and Fetterolf Mining, Inc. (Fetterolf) to replace the polluted water supplies of seven households and a dairy farm[1] in the village of Petersburg, Somerset County. The Yoders (two households and the dairy farm) were granted permission to intervene as plaintiffs, and sought both replacement of their wells, and monetary damages. One to three surface mining sites were alleged to have contaminated the Petersburg water supplies: the Stutzman site (PBS) and the Ross and Mostoller mines (Fetterolf). All are within one-third of a mile of Petersburg. The suit was brought pursuant to Section 601 of the Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.601, and Section 18.2 of the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §1396.20.

---

[1] The contaminated wells are those serving the households of Ronald and Nancy Fleegle, Glenn and Bessie Stutzman, Calvin and Bernice Walker, Fred and Emogen Zerfoss, Bruce and Dorothy Yoder, and Elwood and Sherry Yoder. The well supplying Elwood and Nancy Yoder's dairy farm is also contaminated. The spring serving Margaret Friedline's residence was dewatered, and the replacement well drilled by PBS is now contaminated. Where convenient, the affected parties shall be referred to collectively as "the residents" and water supplies shall be referred to as "the wells".

Following the conclusion of the trial, the chancellor issued an adjudication and decree nisi in favor of the DER and the Yoders. He held PBS and Fetterolf to be jointly and severally liable for the water contamination, and ordered the two companies to provide the residents with permanent alternative water supplies, to implement a plan to prevent further pollution, and to pay damages to the intervenors.

PBS and Fetterolf both filed post-trial motions, which were heard before a court *en banc.* The court *en banc* unanimously denied the motions, adopting the findings and conclusions of the chancellor, and ordering that the decree nisi be entered as the final decree. PBS and Fetterolf have appealed to this Court.

Both appellants assert that the evidence with respect to causation was insufficient to hold them responsible for the pollution of the Petersburg wells. We have carefully reviewed the record, and must disagree. First of all, we are mindful that

> an appellate court is bound by the chancellor's findings of fact, approved by a court en banc, to the same extent as it would be bound by the findings of a jury. The test in either case is whether the findings are adequately supported by the record and whether the factual inferences and legal conclusions based on the findings are correct. . . . Where credibility of the witnesses is important, the chancellor's findings are entitled to particular weight because of the opportunity which was his to observe the demeanor of witnesses on the stand.

*Brentwater Homes, Inc. v. Weibley,* 471 Pa. 17, 21, 369 A.2d 1172, 1174 (1977) (citations omitted). Secondly, the appellees are entitled to the benefit of the most favorable inferences from the evidence, and this is true even where the trial judge has not made detailed find-

ings of fact covering all potential areas of dispute. *Blue Anchor Overall Co. v. Pennsylvania Lumberman's Mutual Ins. Co.*, 385 Pa. 394, 123 A.2d 413 (1956).

The record in the instant matter is voluminous. It includes more than 2000 pages of testimony, and over 100 exhibits were admitted into evidence. The chancellor, in addition to accepting the evidence, testimony, and legal briefs and arguments, viewed the mine sites and the Petersburg area. Although neither he nor the court *en banc* made detailed factual findings, the following summary is consistent with our mandate to view the evidence in the light most favorable to appellees, and is based on the chancellor's express findings that the wells in question were polluted with mine drainage, and that one, two, or all three of the appellants' mine sites were responsible.

The three mining sites are adjacent to one another and form an arc surrounding Petersburg. The Stutzman site is to the north of the village, and is bordered by the Ross site to the west. The Mostoller site lies to the west and southwest, beside the Ross mine. Petersburg lies in a valley and is located topographically downslope of the mining sites. Approximately 200 acres were strip-mined on the three properties.

The residents testified that their water supplies were of good quality before mining began. The DER collected pre-mining samples of several of the households' water, which revealed only small quantities of sulphate and iron, pollutants characteristic of mine drainage, which were found in greatly increased quantities in the post-mining samples. The residents began to notice the degradation of their water supplies from mid-to-end 1980. They testified that the water is malodorous, has a bitter taste and is discolored. It has stained cookware, dishes, laundry and fixtures in their houses a reddish-brown color, and has caused corrosion and clog-

ging of plumbing. The milking equipment at the dairy farm has been similarly stained and corroded, and the plumbing damaged.

PBS conducted surface mining at the Stutzman site from 1975, completing reclamation of the site in 1979. It had operated pursuant to a Mine Drainage Permit issued by the DER; the permit, however, did not authorize discharge of mine drainage into the groundwaters of the Commonwealth. PBS's mining activities interrupted the flow of three nearby springs—the Knupp-Shank, Becker and Friedline springs—for which it drilled replacement wells. The original wells, however, all became contaminated.

The Knupp-Shank and Becker springs[2] which were dewatered are located 100 yards from the Stutzman site. The contaminated Becker replacement well lies between that site and the Stutzman, Walker, Yoder, Zerfoss and Fleegle households. In its answer to DER's complaint, PBS admitted its liability for dewatering the Friedline spring. It drilled a replacement well, which has since degraded to the point it is essentially unusable for domestic purposes.

The Ross and Mostoller mines were operated by Fetterolf's predecessors, Cardinal Mines, then Summit Mines, beginning in 1974 and 1979, respectively. Fetterolf purchased the leases for these sites in 1981, following Summit's bankruptcy. It subsequently entered into negotiations with the DER, terminating in the conclusion of a consent order and agreement on May 27, 1982, which provided, *inter alia,* that the DER would transfer the Mine Drainage Permit for the Ross site upon Fetterolf's promise to complete the reclamation work left unfinished by Summit. (Fetterolf's sister company, Mid-Continent, was surety on the reclamation bonds

---

[2] Replacement of these two springs is not at issue.

posted by Summit. As Summit did not perform the reclamation, the DER declared forfeiture of the bonds. Fetterolf then became involved, and, by performing the reclamation work at the Mostoller site, relieved Mid-Continent of liability for a portion of the bonds, since released by the DER).

Fetterolf's predecessor began surface coal mining at the Ross site in 1974. After Fetterolf acquired the lease and arranged for the transfer of the Mine Drainage Permit,[3] it began mining in August, 1982. Since mining began at that site, four wells adjacent to it, known as the Lamberson, Lamberson-Supanick, Rosey-Snyder, and Fetty wells,[4] have become degraded with high concentrations of sulphates and iron.

The Mostoller site was mined by Summit in 1979 and 1980. After it acquired the lease, and before it concluded the consent order with the DER, Fetterolf replaced two water wells—those of Jerry and Clifford Mostoller[5]—which had become contaminated. These wells were located directly across a road from the Mostoller site. Fetterolf did no mining at the site, but performed reclamation work in accordance with the terms of the consent order.

At trial, four expert witnesses testified regarding the type of pollution present in the residents' wells and its source. There was much testimony concerning the topography of the land and the flow of groundwater. Keith Brady, a DER hydrogeologist, testified that the three mine sites in question are topographically upslope of Petersburg and that, consequently, the groundwaters

---

[3] Like the PBS permit for the Stutzman site, the Ross permit did not authorize the discharge of mine drainage.

[4] The contamination of these water supplies is not an issue in this case.

[5] Again, liability for the replacement of these wells is not before us.

would flow in the direction of its wells. He further stated that the kinds of contaminates found in the wells, high concentrations of sulphates and iron, are characteristic of mine drainage. In addition, the types of mining conducted at the three sites were known to produce mine drainage. Both appellants attack the testimony on the basis of Mr. Brady's qualifications, which they consider inferior to their own experts', inconsistencies in his testimony, etc. Both seek to have this Court embrace the conclusions offered by their expert witnesses, which, of course, we are without power to do. The chancellor's duty was to resolve the innumerable conflicts in the evidence. As long as there is support in the record for his findings, which Mr. Brady's testimony provides, we will not disturb them on appeal. *See Brentwater Homes.*

The record evidence which supports the chancellor's findings regarding causation may be briefly summarized as follows: Three sites in close physical proximity to Petersburg were mined using processes known to produce mine drainage. Various water supplies adjacent to all three were affected by either dewatering or pollution, and PBS and Fetterolf provided replacement water supplies, some of which were subsequently contaminated by sulphates and iron. In addition to the sites bordering the mines which were affected, there was evidence of similar contamination in two locations between the mines and the Petersburg wells. The Becker replacement well, mentioned above, was between the PBS Stutzman site and many of the contaminated Petersburg wells. The so-called "New Bore Hole", where pollution was found, was located between Fetterolf's Ross and Mostoller sites and Petersburg. The Petersburg wells contain pollutants which are characteristic of mine drainage and all became polluted for the first time

after mining in the area began. The mining at all three sites was conducted upslope of the affected wells, and the groundwater travels toward Petersburg. While it was impossible to ascertain the exact source of the residents' water pollution with any degree of certainty, we must conclude that the chancellor's determination that the evidence compellingly[6] links PBS and Fetterolf to the pollution which has invaded the Petersburg wells is amply supported by the record.

Fetterolf argues that, even if it is found to be liable for the pollution, the DER has waived its right to bring suit because of the following language contained in the consent order and agreement:

WAIVER OF LEGAL ACTIONS

23. So long as Fetterolf fully complies with all the provisions and requirements set forth in this Consent Order and Agreement within the times specified for such performance, and otherwise complies with the Surface Mining Act, The Clean Streams Law, other applicable laws, and permits, the Department shall not institute any action at law or in equity for the violations identified in this Consent Order and Agreement. The Department, however, does not waive its right to institute any action against Fetterolf, its officers, agents or assigns, for any violations of law resulting from discharges to or contamination of the waters of the Commonwealth caused or contributed to by Fetterolf. If Fetterolf fails to comply fully with any of the provisions and requirements hereof in a timely manner, the

---

[6] The parties dispute whether a clear and convincing or preponderance of the evidence standard should apply. Because the chancellor, whose duty it is to determine the weight of the evidence, found that the evidence clearly and convincingly established liability, we need not address the issue.

Department may institute any appropriate action based upon any violations caused by Fetterolf.

24. Fetterolf shall not be considered in violation of the law for any violations currently existing on any of the mining or mine drainage permits it is assuming from Summit Mines, Inc., which were caused by Summit Mines, Inc., unless and until Fetterolf fails to correct existing violations by the dates enumerated in this Consent Order and Agreement or unless said violation is exacerbated by any action or inaction of Fetterolf.

The chancellor determined that the consent order only applied to specifically enumerated violations identified in the agreement, and we agree with this interpretation.

We note initially that Fetterolf does not contend that the agreement is ambiguous. Accordingly, we look to the terms of the instrument itself to determine whether the parties intended these provisions to apply in the instant case. "It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 498 Pa. 45, 48-49, 444 A.2d 659, 661 (1982) (citations omitted). This consent order and agreement was negotiated between two corporations, Fetterolf and Mid-Continent, represented by counsel, and the DER, a state agency, also represented. After identifying the parties, the agreement goes on to list the bonds the DER held with respect to Summit Mining, upon which Mid-Continent was surety. Summit having failed to reclaim the mining sites, these bonds were forfeited by the DER (Para. 13 of the agree-

ment). The DER agreed, however, to delay collection of the bonds in order to allow Mid-Continent, through Fetterolf, to perform reclamation (Paras. 16, 17). Fetterolf thus obligated itself to perform this reclamation (consisting of backfilling, regrading, spreading of topsoil, liming, fertilizing, and seeding) according to a set schedule in order to eliminate Summit's violations. Significantly, the term "violations" was defined in the agreement (Para. 12) as Summit's violations in having abandoned its mining permit areas and failing to reclaim same.[7]

With this background in mind, we now consider the import of the above-quoted waiver provisions. Paragraph 23 of the agreement limits its application to "the violations identified in this Consent Order and Agreement." Paragraph 24 of the agreement is limited in its application by the provisions of paragraph 33: "Nothing herein contained shall be construed to relieve or limit Fetterolf from complying with the terms and conditions of any plan approval or permit existing, or hereafter issued to Fetterolf by the Department." It is a well settled principle of contract construction that the entire contract should be read as a whole, with each part interpreted with reference to the whole. *See e.g., Philadelphia v. Philadelphia Transportation Co.,* 345 Pa. 244, 26 A.2d 909 (1942). Further, "contracts must be construed with reference to their subject matter and

---

[7] Paragraph 12 provides:
The violations referenced in paragraphs 9 and 11 shall hereinafter be referred to collectively as 'Violations'.
Paragraphs 9 and 11 provide, respectively:
9. All of the above-referenced mining permit areas were abandoned and had no backfilling equipment present on May 18, 1981.
11. Summit has failed and continues to fail to reclaim the above-mentioned mining permit sites.

obvious purposes, and, however general the language may be, their scope and effect are necessarily limited and controlled thereby." *Camden Safe Deposit and Trust Co. v. Eavenson,* 295 Pa. 357, 363, 145 A. 434, 435 (1929). Finally, "where a public interest is affected, an interpretation is preferred which favors the public." *Philadelphia,* 345 Pa. at 250, 26 A.2d at 912. Here, we conclude that the waiver provisions in the consent order must be confined to the subject matter of that agreement: the reclamation by Fetterolf of the mining sites abandoned by Summit. Hence, the DER's waiver of its right to institute legal action only applies with respect to the violations of Summit Mining identified in the agreement, which Fetterolf contracted to remedy.

Fetterolf next contends that the DER should be equitably estopped from bringing this suit, in that it was aware of the well contamination in Petersburg when it signed the consent order and failed to apprise Fetterolf of either the existence of the contamination or of its potential liability therefor. Fetterolf, however, did not raise, argue or brief this issue on post-trial motions before the court *en banc.* Accordingly, the issue has not been preserved for our review, and we need not consider it. *See* Pa. R.A.P. 302(a); Pa. R.C.P. No. 227.1(b)(2).

Both appellants dispute the chancellor's imposition of joint and several liability. Before we address that precise question, we will briefly discuss the application of the theories of liability upon which the chancellor relied, both statutory and common law.

PBS does not address the question of whether it could be liable under the theories outlined below. Rather, it contends that appellees have not met their burden of proving causation, thereby insulating PBS from liability, and, secondly, that the expert testimony it offered clearly demonstrated that the PBS Stutzman site is not the cause of the Petersburg well contamination. Both of

these arguments are factual in nature and have been addressed in the first section of this opinion.

Fetterolf, on the other hand, vigorously disputes that it may be held liable under either statutory or common law nuisance theories. First, it contends that there must be a "minimal showing of culpability" under the Clean Streams Law. For this proposition, it relies on this Court's opinion in *Philadelphia Chewing Gum Corp. v. Commonwealth,* 35 Pa. Commonwealth Ct. 443, 387 A.2d 142 (1978), *affirmed* in part *sub nom. National Wood Preservers v. Commonwealth,* 489 Pa. 221, 414 A.2d 37 (1980), *appeal dismissed,* 449 U.S. 803 (1980). This reliance is misplaced. We have recognized that *Philadelphia Chewing Gum* is of questionable continuing validity[8] in light of *National Wood,* in which our Supreme Court specifically held that fault is not a prerequisite to liability under Section 316 of the Clean Streams Law, 35 P.S. §691.316.

In further support of its argument, Fetterolf states that some contamination of the groundwater is an unavoidable consequence of mining activities. While that may well be true, it does not follow that the contamination is thus excused. Our Supreme Court, in the landmark case of *Commonwealth v. Barnes & Tucker Co.,* 455 Pa. 392, 319 A.2d 871 (1974), discussed both the statutory and common law theories of liability in a case involving post-mining discharges from an abandoned mine. Following a lengthy discussion of the evolution of the provisions of the Clean Streams Law dealing with mine drainage pollution, it concluded that the discharges at issue therein were enjoinable under both §3 of the Clean Streams Law, 35 P.S. §691.3 and as a common law public nuisance. Furthermore, liability was not

---

[8] *See Bonzer v. Department of Environmental Resources,* 69 Pa. Commonwealth Ct. 633, 642, 452 A.2d 280, 285 (1982).

grounded upon fault in either instance: 1) "[T]he fact that Barnes & Tucker operated in accordance with The Clean Streams Law cannot give rise to the conclusion that such operation was *authorized* by that law," and 2) "The absence of facts supporting concepts of negligence, foreseeability or unlawful conduct is not in the least fatal to a finding of the existence of a common law public nuisance." *Id.*, 455 Pa. at 414-415, 319 A.2d at 883 (emphasis in original).

Turning first to an examination of the relevant statutory provisions, it is clear that liability without fault may attach under the circumstances at issue here. Section 3 of the Clean Streams Law, provides:

> [t]he discharge of sewage or industrial waste or any substance into the waters of this Commonwealth, which causes or contributes to pollution as herein defined or creates a danger of such pollution is hereby declared not to be a reasonable or natural use of such waters, to be against public policy and to be a public nuisance.

Section 1, 35 P.S. §691.1, is the definitional section of the statute. Included under the definition therein of "Industrial waste" is mine drainage. The definition of "Waters of the Commonwealth" in Section 1 includes "bodies or channels of conveyance of . . . undergound water." In pertinent part, the section defines "Pollution" as:

> contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by al-

teration of the physical, chemical or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters.

The Clean Streams Law broadly regulates discharges of industrial waste into the waters of the Commonwealth.[9] It provides that such discharges allowed without or contrary to the terms of a permit are nuisances.[10] Further, discharges from mining operations are specifically covered by §315(a), 35 P.S. §691.315 (a).[11] That section declares that allowing any discharges from a mine, including post-mining discharges, without or contrary to the terms of a permit, is a nuisance, Both §611 of the Clean Streams Law, 35 P.S. §691.611, and

---

[9] Section 301, 35 P.S. §691.301.

[10] Section 307(c), 35 P.S. §691.307(c).

[11] In pertinent part, Section 315(a) provides:

No person or municipality shall operate a mine or allow a discharge from a mine into the waters of the Commonwealth unless such operation or discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department. Operation of the mine shall include preparatory work in connection with the opening or reopening of a mine, refuse disposal, backfilling, sealing, and other closing procedures, and any other work done on land or water in connection with the mine. A discharge from a mine shall include a discharge which occurs after mining operations have ceased, provided that the mining operations were conducted subsequent to January 1, 1966, under circumstances requiring a permit from the Sanitary Water Board under the provisions of section 315(b) of this act as it existed under the amendatory act of August 23, 1965 (P.L. 372, No. 194). The operation of any mine or the allowing of any discharge without a permit or contrary to the terms or conditions of a permit or contrary to the rules and regulations of the department, is hereby declared to be a nuisance.

§18.6 of the Surface Mining Conservation and Reclamation Act, 52 P.S. §1396.24, in identical terms,[12] make it unlawful to fail to comply with any permit or to cause water pollution in connection with mining.

The above-referenced statutory provisions clearly provide ample support for the chancellor's imposition of liability upon PBS and Fetterolf to abate their statutorily-declared public nuisances.[13] Neither appellant had mine drainage permits which authorized the discharge of mine drainage,[14] bringing each within, *inter alia,* the

---

[12] Both sections provide, in part:

It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, to cause air or water pollution in connection with mining and not otherwise proscribed by this act, or to hinder, obstruct, prevent or interfere with the department or its personnel in the performance of any duty hereunder or to violate the provisions of 18 Pa. C. S. sections 4903 (relating to false swearing), 4904 (relating to unsworn falsification to authorities).

[13] Although neither party has contested the authority for the relief granted, we note that the Clean Streams Law and Surface Mining Conservation and Reclamation Act authorize: the abatement of "any activity or condition declared . . . to be a nuisance (35 P.S. §691.601), injunctive relief to enforce compliance (52 P.S. §1396.20), and replacement of affected water supplies with an alternative source adequate in quantity and quality for the purposes served by the supply. (52 P.S. §1396.4b(f)).

[14] Fetterolf argues that, by complying with the provisions of the consent order, the discharges from its sites were "permitted." In so arguing, it attempts to fall within the terms of footnote 12 of the *Barnes & Tucker* opinion, in which the Court noted: "[w]e are not called upon to decide the more difficult question of whether a public nuisance can exist during the pendency of a valid mine drainage permit." 455 Pa. at 415, 319 A.2d at 883. The argument

terms of Section 315(a) and subject to Section 601's abatement mandate. In light of our disposition of this issue, it is unnecessary to discuss the alternative theory of common law public nuisance.[15]

The correctness of the chancellor's imposition of joint and several liability is the sole remaining issue. Both appellants dispute that Section 433B of the Re-

---

that the consent order "permitted" these discharges was rejected above, when we determined that it did not apply to this situation. Further, there is no language in either the consent order or the mine drainage permit Fetterolf held for the Ross site which authorized the discharge of mine drainage into the groundwater.

[15] However, one point raised by Fetterolf is deserving of comment. It contends that the facts of this case are controlled by our Supreme Court's 1855 decision in *Wheatley v. Baugh*, 25 Pa. 528 (1855). That case concerned the dewatering of a spring by a mine company operating on land adjacent to the plaintiff. The Court distinguished waters in subterranean watercourses, *i.e.*, definable channels, from "percolations," which spread in all directions. Because it determined that it would be impossible to avoid disturbing percolating water without relinquishing the necessary enjoyment of one's own land, it refused to hold the defendant company responsible for what it termed a natural and lawful use of its property. *Wheatley* is clearly distinguishable, especially when read in light of the much more recent pronouncement of the Court in *Barnes & Tucker*. First of all, *Wheatley* dealt with the dewatering, not contamination, of a spring. Secondly, the Court found a common law public nuisance to exist, even though it recognized that the discharge from Barnes & Tucker's abandoned mine was essentially a natural one, *Barnes & Tucker*, footnote 16, 455 Pa. at 420, 319 A.2d at 886, unlike the nuisance cases upon which it relied: *Pennsylvania R.R. v. Sagamore Coal Co.*, 281 Pa. 233, 126 A. 386 (1924) (discharge of acid mine drainage into Indian Creek) and *Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co., Inc.*, 367 Pa. 40, 79 A.2d 439 (1951) (discharge of polluted water from a pulp and paper mill into the Clarion River). *Wheatley* being inapplicable, we would have no trouble concluding that the analysis employed in *Barnes & Tucker* relating to the application of the common law doctrine of public nuisance is applicable here.

statement (Second) of Torts (1982) (Restatement),[16] which sets forth the principle of alternative liability, and upon which the chancellor relied, is applicable. The error, appellants argue, is that the section requires a showing of *tortious conduct,* which is absent when absolute liability is imposed. Although our Supreme Court has adopted Restatement §433B, *see e.g., Snoparsky v. Baer,* 439 Pa. 140, 266 A.2d 707 (1970), the precise question appellants raise is evidently one of first impression in Pennsylvania.

Other jurisdictions have held that multiple defendants in a nuisance action may be subject to joint and several liability. *See e.g., Velsicol Chemical Corp. v. Rowe,* 543 S.W.2d 337 (Sup. Ct. Tenn. 1976); *Michie v. Great Lakes Steel Div., National Steel Corp.,* 495 F.2d 213 (6th Cir. 1974), *cert. denied,* 419 U.S. 997 (1974); *Landers v. East Texas Salt Water Disposal Co.,* 151 Tex. 251, 248 S.W.2d 731 (1952). These cases, rather than relying on the doctrine of alternative liability as embodied in Section 433B, adopt the principles of independent concurring liability.

----

[16] Section 433B provides:

(1) Except as stated in subsection (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.

(2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

(3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

As stated by the Supreme Court of Texas in its landmark decision in *Landers,* the rule it adopted was as follows:

> Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit.

*Id.,* 151 Tex. at 256, 248 S.W.2d at 734. In *Landers,* plaintiff's suit against a salt water disposal company and an oil company for independently polluting his lake with salt water was dismissed by the trial court for misjoinder, because no concert of action between the defendants was alleged. The Supreme Court of Texas reversed, adopting the new rule stated above, which had the effect of shifting the burden of proof of which damages were caused by which company to the defendants.

*Michie* involved a multiple-plaintiff suit against three corporate defendants alleged to have created a nuisance by virtue of pollutants released from their factories into the air. The Sixth Circuit Court of Appeals held that the Michigan Supreme Court would adopt the so-called modern rule of the *Landers* case, upon which the Michigan Court had previously relied. It further stated: "[a]ssuming plaintiffs . ... prove injury and liability as to several tortfeasors, the net effect of Michigan's new rule is to shift the burden of proof as to which one was responsible and to what degree from the injured party to the wrongdoers." *Michie,* 495 F.2d at 218.

The Supreme Court of Tennessee, in *Velsicol,* relied upon both *Landers* and *Michie* in reaching a similar re-

sult. In that case, multiple plaintiffs sued the Velsicol Chemical Corporation for damages resulting from air and water pollution alleged to be emanating from its plant. Velsicol, in turn, filed a third-party complaint against five third-party defendants, alleging that each had emitted air and water pollutants, and were liable to Velsicol for contribution or indemnity. In reversing the trial court's dismissal of the third-party complaint, the Court held:

> It is our conclusion that the rule stated and applied in the Landers and Michie cases is. . . . consonant with modern legal thought and pragmatic concepts of justice. . . . Accordingly, we . . . adopt the rule of Landers and Michie for determining joint and several liability when an indivisible injury has been caused by the concurrent, but independent, wrongful acts or omissions of two or more wrongdoers, *whether the case be one of negligence or nuisance.*

*Velsicol*, 543 S.W.2d at 343 (footnote omitted) (emphasis added).

The rule these cases apply has been summarized in Section 879 of the Restatement, which provides: "If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive." In a different context (the joint liability of three physicians for negligent diagnosis and treatment), our Superior Court has adopted Restatement §879. *Capone v. Donovan*, 332 Pa. Superior Ct. 185, 480 A.2d 1249 (1984). We believe the rule should apply in the present situation as well.

However, whether we apply Restatement §433B or §879, we must address the question appellants raise, alluded to above: is tortious conduct, which appellants

seem to assume presumes an element of culpability, a prerequisite to a finding of joint and several liability? The *Landers, Michie,* and *Velsicol* courts all appear to have assumed that the defendants could be characterized as "wrongdoers." (Of course, there is no question that tortious conduct was present in *Capone*). While the facts of each case are distinguishable from those before us (and, indeed, had not been established, as none of the cases had yet gone to trial), we believe, for the reasons which follow, that it is logical to include nuisance-creators within the definition of "wrongdoers."

Appellants' argument is, apparently, that because they did not intend the pollutional consequences of their activities, which may, in fact, have been inevitable, they are not "at fault", and, thus, not "wrongdoers." This is perhaps true in a moral sense. However, in a legal sense, fault is not necessarily controlling. "Wrongdoer" is defined in Black's Law Dictionary (5th Ed. 1979) (Black's) as "one who commits an injury; a tortfeasor. The term ordinarily imports *an invasion of right to the damage of the party who suffers such invasion.*" Black's 1446. A "tort-feasor" is defined as "[a] wrongdoer; one who commits or is guilty of a tort." Black's 1335. Finally, the definition of a "tort" is, in part:

> [a] private or civil wrong or injury . . . A violation of a duty imposed by general law or otherwise . . .
>
> \* \* \* \*
>
> A legal wrong committed upon the person or property independent of contract. It may be either (1) a direct invasion of some legal right of the individual; (2) the infraction of some public duty by which special damage accrues to the individual; (3) the violation of some private obligation by which like damage accrues to the individual.

Black's 1335.

Here, there is no question that the facts of this case involve the invasion of a legal right[17] of the residents of Petersburg. Similarly, it is undisputed that damages have accrued to the residents by reason of that invasion. The perpetrator of the invasion is called, by legal definition, a "wrongdoer" or "tortfeasor." Although we agree that, as commonly used, those terms usually carry connotations of "fault", in the sense of culpability, they are not so limited by pure definition.

Further, we do not consider the facts of this case or the disputed definitions in a vacuum. Rather, our conclusion that PBS and Fetterolf may be denominated "wrongdoers" is made with reference to the two broad and comprehensive statutes, the Clean Streams Law and the Surface Mining Conservation and Reclamation Act, which govern their mining activities. Appellants' conduct, the discharge of pollution into the waters of the Commonwealth, has been statutorily declared to be unlawful, against public policy, and a public nuisance. This is true regardless of whether the activities which caused the discharges were conducted in a negligent, reckless, or perfectly reasonable manner. Fault, thus, is irrelevant for purposes of the statutory declaration that the conduct is unlawful.

We do not intend to imply by our conclusion that the nuisance here at issue is itself a type of tortious conduct. In discussing the common law doctrine of public nuisance, the *Barnes & Tucker* Court expressly stated

---

[17] *See e.g.,* Pa. Const. Art. I, §27:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

that "nuisance involves an area of tort liability and not a type of tortious conduct." *Id.*, 455 Pa. at 410-411, 319 A.2d at 881. The court was obviously attempting to dispel the misconception that nuisance necessarily arises from fault-based conduct. It went on to state that

> [t]he assumption [that negligence, foreseeability or unlawful conduct must be present in order for a common law public nuisance to exist] . . . is 'based upon an entirely mistaken emphasis upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that negligence is merely one type of conduct which may give rise to a nuisance.' W. Prosser, Law of Torts, §88 at 595 (3d ed. 1964).

*Id.* 455 Pa. at 414, 319 A.2d at 883.

Accordingly, based on the statutory declaration that their conduct is unlawful, we find no error in the chancellor's having found PBS and Fetterolf to be jointly and severally liable for the contamination of the Petersburg wells.

In summation, having found ample support in the record for the chancellor's finding that appellants' mine sites were the source(s) of the Petersburg residents' water contamination, having found liability to exist by virtue of the statutory provisions discussed herein, and having concluded that the independent concurring "tortious conduct", as herein defined, of the appellants has resulted in the indivisible[18] contamination of the residents' water supplies, the final decree, and the relief therein specified, is hereby affirmed.

------

[18] Neither appellant has addressed whether it considers the damages here to be indivisible. This being a question of law, however, *see Capone* and due to the nature of the injury, we have no difficulty concluding that the harm here is incapable of apportionment.

## ORDER

AND NOW, this 15th day of December 1987, the final decree of the Court *En Banc* of the Court of Common Pleas of Somerset County, dated April 30, 1986, is affirmed.